UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

MARK F. GUTIERREZ,

Plaintiff,

v.

ANDREW SAUL, Acting Commissioner of
Social Security,[1]

Defendant.

Case No. 2:17-cv-02365-MMD-EJY

**REPORT AND RECOMMENDATION**

Re:  Motion for Reversal and Remand
(ECF No. 12)

Plaintiff Mark F. Gutierrez ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying his application for disability insurance ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act.  For the reasons stated below, it is recommended that the Commissioner's decision be remanded to the Social Security Administration under the Compassionate Allowances program for further proceedings consistent with this Report and Recommendation.

## I.    BACKGROUND

On April 2, 2014, Plaintiff filed applications for DIB and SSI alleging disability beginning November 27, 2012.  Administrative Record ("AR") 13.  The Commissioner denied Plaintiff's claims by initial determination on August 29, 2014, and again upon reconsideration on December 16, 2014.  AR 124–27, 130–36.  On December 22, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 137–38.  After conducting a hearing on May 5, 2016 (AR 31–59), ALJ Norman L. Bennett issued his determination that Plaintiff was not disabled on June 3,

---

[1]    Andrew Saul is the current Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

2016 (AR 13–24). On June 20, 2016, Plaintiff requested that the Appeals Council review the decision by the ALJ. AR 180. The Appeals Council denied Plaintiff's request for review on July 5, 2017. AR 1–6. This civil action followed.

## II.    STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). In reviewing the Commissioner's alleged errors, courts must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

"When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198, *citing Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted). Finally, a court may not reverse an ALJ's decision based on an error that is harmless. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## III.    DISCUSSION

### A.    <u>Establishing Disability Under The Act</u>

To establish whether a claimant is disabled under the Act, there must be substantial evidence that:

> (a)    the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and

(b)     the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999), *citing* 42 U.S.C. § 423(d)(2)(A).  "If a claimant meets both requirements, he or she is disabled."  *Id.*

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).[2]  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098; 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five.  *Tackett*, 180 F.3d at 1098.

The five steps are:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(b).

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(c).

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(d).

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(e).

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  *See* 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy

_____

[2]     All citations herein are to the regulations in effect at the time of the ALJ's June 3, 2016 decision.

that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits.  *See* 20 C.F.R. §§ 404.1520(f), 404.1562.  If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits.  *See id.*

*Id.* at 1098–99 (internal alterations omitted).

**B.    Summary of ALJ's Findings**

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since November 27, 2012, the alleged onset date of disability.[3]  AR 15.  At step two, the ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "mild degenerative disc disease in the lumbar spine; obesity; and bipolar disorder."  *Id.*  At step three, the ALJ found that Plaintiff's impairment did not meet or equal any "listed" impairment in 20 C.F.R., Part 404, Subpart ("Subpt.") P, Appendix ("App.") 1.  AR 16.

In preparation for step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[4] to:

[P]erform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand/walk 6 hours in an 8 hour workday.  The claimant can sit 6 hours in an 8 hour day.  The claimant can engage in occasional postural activities.  The claimant is limited to simple, repetitive tasks and occasional contact with supervisors, coworkers and the general public.

AR 17.

At step four, upon review of the claimant's earning record and work history report, the ALJ found that "the following occupations meet the earnings, and duration requirement of 'past relevant work' . . . : [r]ide attendant, DOT[5] 342.677-010, . . . [c]ashier, DOT 211.462-010, . . . [s]tore

---

[3]    The Commissioner found Plaintiff did not engage in substantial gainful activity since the alleged onset date despite "[t]he claimant's earnings record indicat[ing] income of $5,461.28 in 2013 (Exhibit 8D). . . . [T]his income was from unemployment benefits and not from work activity."  AR 15.

[4]    "Residual functional capacity" is defined as "the most you can still do despite your limitations."  20 C.F.R. § 416.945(a)(1).

[5]    DOT is an abbreviation for *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991).

manager, DOT 185.167-046, . . . [and, c]omposite job consisting of: a) Stock supervisor, DOT 921.133-018, . . . and b) Stock clerk, DOT 299.367-014 . . . ." AR 22.  The ALJ determined "the claimant is unable to return to his past relevant work" because "the demands of the claimant's past relevant work exceed that of his current residual functional capacity." AR 23.

In preparation for step five, the ALJ noted that Plaintiff was "born on December 10, 1986 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963)."  *Id*.  The ALJ noted that Plaintiff had a limited education, but "is able to communicate in English."  *Id*.  The ALJ then added that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills.  (*See* SSR [Social Security Ruling] 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)."  *Id*.

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))."  *Id*.  Specifically, the ALJ found Plaintiff could perform the "light, unskilled" occupations of: "fast food worker," DOT 311.472-010; "assembler, DOT 729.687-010"; and, "mail clerk, DOT 209.687-026."  *Id*.  The ALJ based his decision on the testimony of the vocational expert at the administrative hearing, and further, determined that the vocational expert's testimony was consistent with the information contained in the DOT.  *Id*.

After finding Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," the ALJ concluded that "[a] finding of not disabled" was "appropriate under the framework of the above-cited rule."  *Id*. (internal quotation marks omitted).  The ALJ concluded that "the claimant has not been under a disability, as defined in the Social Security Act, from November 27, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))."  *Id*.

C.      **Summary of Medical Evidence**

1.      **Chronology of Medical Treatment**

On August 28, 2012, a radiological examination taken of Plaintiff's lumbar spine at Red Rock Radiology revealed Plaintiff had "[s]light disc space narrowing consistent with degenerative disc disease." AR 362. The medical record did not reflect any significant clinical finding (such as reduced range of motion or abnormal gait) or any significant treatment (such as epidural injections, chiropractic treatments, or physical therapy) relating to Plaintiff's physical health otherwise.

On November 26, 2012, Plaintiff was treated at North Vista Hospital's emergency room because he felt "anxious and started feeling suicidal. He stopped taking his Seroquel 1 week ago because it makes him sleepy and [he] has to drive to Primm everyday [sic] for work." AR 364. Plaintiff was subsequently transferred to inpatient care at Spring Mountain Treatment Center from November 27, 2012 through November 30, 2012. AR 374–77. There, Plaintiff reported that:

> He made a suicide attempt [after the death of his grandfather nearly one year ago] and was started on Seroquel by his primary care doctor, primarily for sleep. . . . He states that his sleep had improved, but over the past two months he has had frequent crying spells, severe anxiety, thoughts of death and states that he has wanted to harm himself. He has lost about 25 pounds due to poor appetite. His symptoms are impairing him at work. He has guilt about the death of his grandfather but knows that he is not responsible. He also endorses anhedonia and isolation from friends and has stopped doing any activities outside of work. He is also starting to feel burdensome to his family.

AR 374. Upon discharge, Plaintiff was diagnosed with "major depressive disorder," assigned a Global Assessment of Functioning ("GAF") score of 65, and prescribed Zoloft, Atvian, and Vistaril. AR 375.

Plaintiff was again admitted to Spring Mountain Treatment Center from February 14, 2013 through February 18, 2013, for "depression and suicidal symptoms." AR 376. Plaintiff reported being "stressed by his mother's illness. . . . [Plaintiff] has been attending the outpatient intensive program but for a few days before admission had no medications because of the same financial difficulties so he was getting more and more depressed." *Id*. Plaintiff "had no energy and no motivation"; "was not taking care of his grooming and hygiene"; "could not sleep sometimes and other times he was sleeping too much"; and, "was irritable and his appetite was poor." *Id*. Plaintiff described "intrusive thoughts of what he referred to as hallucinations telling him to give up." *Id*.

6

After being placed on Klonopin, Zoloft, and Depakote, Plaintiff experienced "two days of no mood swings and he felt ready to resume treatment at IOP [the Intensive Outpatient Program]." *Id*. During this time, Plaintiff experienced "no behavioral problem[s], no suicidal behavior, and no psychosis." *Id*. Three to four days following admission, Plaintiff "wanted to be discharged and continue treatment at IOP." *Id*. Plaintiff was diagnosed with "bipolar disorder" and "chest pain"; assigned a GAF score of 55; and, prescribed Depakote, Seroquel, and Zoloft. *Id*. On discharge, Plaintiff's "appearance was appropriate"; was "able to engage"; had "normal rate and rhythm" of speech; and, displayed "normal" motor activity, "fine" mood and affect, "goal directed" thought processes, "no hallucinations and no delusions," "improved" insight and judgment," and "stable" cognitive functioning. *Id*.

On September 19, 2013, Jessica Browning, Ph.D., a clinical psychologist, performed a psychological evaluation of Plaintiff at the request of the Nevada Bureau of Disability Adjudication. AR 378–85. At his evaluation, Plaintiff complained of "[d]epression, anxiety, panic attacks, loss of bowel movements [during panic attacks]. He report[ed] that many of these symptoms began approximately 18 months ago[] back when [his] grandpa died. The symptoms occur all day, and Mr. Gutierrez feels that his depression and anxiety comes and goes." AR 378 (internal quotation marks omitted). Plaintiff told Dr. Browning that he was "sexually abused by family members at ages 5, 7, and 13. . . . [H]is parents were abusing drugs . . . at the time, but they have been clean for 12 years." *Id*. Plaintiff "was very close to his grandfather, who was like a father to him when his parents were absent or on drugs." *Id*. Plaintiff reported "anger problems, anxiety, depression, symptoms of elevated mood, . . . mood swings, . . . symptoms of PTSD . . . [and] daily panic attacks." *Id*. Plaintiff said he was off the medication Seroquel "for at least 2 months. [Plaintiff] will not go back to the clinic where he was prescribed the medication because he has[] a bill that he is not able to pay at this time." AR 379 (internal quotation marks omitted). Dr. Browning noted that Plaintiff:

> presents as friendly, cooperative, overweight, and sad. He is casually groomed in a red T-shirt. His posture is normal. His grooming is adequate; he has a beard. His hygiene is good. His mood is depressed. Affect is appropriate, full range, and congruent with mood. He exhibits speech that is normal in rate, rhythm, and is coherent and spontaneous. His speech is soft in volume; pronunciation is clear. He is easily distracted at times. There are signs of anxiety, including restlessness. He reports occasionally hearing things: "movements... it could be the ghost." His

7

mother also believes that there is a ghost in the house.  Mr. Gutierrez also reports: "[I] see blurs pass me."  He reports that the last time he heard or saw something was: "last night."  No signs of withdrawal or intoxication are observed.

AR 380.  Plaintiff performed serial sevens with one error, and serial threes with no errors.  *Id*. Plaintiff was able to spell "world" backwards without difficulty, and received 5/5 on the Mini Mental Status Exam.  *Id*.  Plaintiff "was able to repeat . . . three unrelated words . . . with only one trial. After five minutes, he was able to recall one of the three words.  After 15 minutes, he was still able to recall one of the three words."  *Id*.  Plaintiff was able to perform alphanumeric counting and sequencing without making any mistakes.  *Id*.  Plaintiff demonstrated a moderate to severe deficit in his fund of information:

> Mr. Gutierrez did not know that Rome is the capital of Italy, the author of *A Tale of Two Cities* is Dickens, water boils at 212 degrees Fahrenheit, there are 366 days in a leap year, December is the month before January, George Washington was the first president of the United States, or that Arabic is the language spoken in Iraq. However, he knew that[] there are 12 eggs in a dozen, a group of wolves is called a "pack," and the sun sets in the west.

AR 380–81.  Plaintiff performed calculations of simple math problems without providing any incorrect responses.  AR 381.  Dr. Browning opined that Plaintiff demonstrated (i) a moderate to severe deficit in his vocabulary; (ii) a mild to moderate deficit in his understanding of proverbs; (iii) a mild to moderate deficit with respect to similarities; and, (iv) a mild deficit with respect to judgment and comprehension.  *Id*.  Plaintiff was "able to write his name legibly, quickly, and with ease."  *Id*.  Plaintiff "did not make any errors on simple tasks such as reciting the alphabet [or] counting from one to ten."  *Id*.  Plaintiff "scored 27/30 on the Mini Mental Status Exam, which suggest that he does not have cognitive impairment and is in the 'normal' range for someone of his education.  Based on [Plaintiff's] self-report and behavior, it does not appear that [his] thoughts have ever been distorted to a psychotic degree."  *Id*.

Plaintiff told Dr. Browning that he lives in a house with his parents, and that his daily routine consists of laying in a room, staring at walls, watching TV, and forgetting to eat.  AR 382.  Plaintiff "reports that his mom does the household chores . . . .  [O]nce per month, 'when manic,' he does some cleaning.  [He] reports not being able to go out for any amount of time.  He does not pay his own bills and reports being able to 'sometimes,' handle money."  *Id*.  Plaintiff "reports having no

8

outside activities or hobbies." *Id.* "Mr. Gutierrez reports that his relationships with family members are 'fair,' [and] relationships with friends are 'good.' . . . Mr. Gutierrez reports typically getting around with his parents in their car. He reports being able 'sometimes' to get around alone." *Id.*

Dr. Browning assessed Plaintiff with "bipolar disorder and anxiety of posttraumatic origin. [Plaintiff] also suffers from daily panic attacks. [Plaintiff] seems most limited by his depression, suicidal ideation, and explosive rage. However, [Plaintiff] is motivated to get treatment and he would like to go back to work." *Id.* Dr. Browning believed that "with appropriate treatment Mr. Gutierrez will be able to greatly expand his social and vocational activities to include many more activities than he is currently able to perform." *Id.*

Specifically, Dr. Browning believed Plaintiff is:

1. Able to understand, remember, and carry out simple and detailed, but not complex instructions.

2. Based on his interactions with [Dr. Browning] and his reported mood swings and rage, . . . he is moderately to severely impaired in his ability to interact appropriately with the public. He may do better in an environment with minimal social demands.

3. Based on his interactions with [Dr. Browning] and his reported mood swings and rage, . . . he is mildly to moderately impaired in his ability to interact appropriately with coworkers and with supervisors.

4. Based on his performance on the examination of cognitive functions, . . . he is mildly to moderately impaired in his ability to maintain concentration and attention, and has some trouble with delayed recall, which would further restrict him to simple tasks at this time.

AR 383.

Three months later, on December 3, 2013, Plaintiff reported to the emergency department at North Vista Hospital with "suicidal thoughts, [d]epression, [and a]nxiety." AR 388. Plaintiff had attempted suicide and appeared with "multiple wounds to bilateral arms from cutting himself." AR 393. From December 6, 2013 through December 9, 2013, Plaintiff was hospitalized at Summerlin Hospital for "[s]uicidal ideation with hallucinations." AR 414; *see also* AR 412–22.

Upon discharge from Summerlin Hospital, Plaintiff began treatment through Southern Nevada Mental Health's IOP. AR 479–90, 520–23. On December 10, 2013, Plaintiff was reported as "pleasant and cooperative," and demonstrated "no objective evidence of psychosis on

exam[ination]"; "[n]o unusual behaviors"; "good" eye contact; "normal rate" of speech; "ok[ay]" mood; and, "full affect." AR 479. Plaintiff was diagnosed with "depressive disorder" and "personality disorder." *Id*. On December 12, 2013, Plaintiff was noted as "pleasant and cooperative with staff," and was observed "watching television and socializing with peers" in the day room. AR 489. At the same time, however, Plaintiff reported "hear[ing] voices at night." *Id*. Plaintiff mentioned that he was on medical leave from this previous job, but "did not improve enough to return and lost his job and subsequently his insurance." *Id*.

On February 21, 2014, Plaintiff reported a "worsening of depression, anger, and anxiety"; "poor energy and motivation"; and, "difficulties . . . sleeping." AR 483. On April 7, 2014, Plaintiff was reported being "stable" on his medications. AR 481.

On April 14, 2014, a nurse met with Plaintiff soon after his second grandfather passed away. *Id*. Plaintiff was "depressed" yet "logical and coherent," and demonstrated "low" energy levels, attention, and concentration. *Id*. On May 16, 2014, Plaintiff reported being "depressed," had "difficulty sleeping," and was "wak[ing] up at night having panic attacks." AR 522. Plaintiff stated that "Trazodone did not help, and he stopped taking it. Seroquel had helped better than Ambien and [T]razodone. [Plaintiff] reports that he did [sic] not think Zoloft is working." *Id*. Plaintiff again reported a "worsening of depression[], anger and anxiety," and was observed with "unstable mood, insomnia, and uncontrolled anxiety." AR 522–23. Plaintiff was diagnosed with "[p]anic [d]isorder" and "[b]orderline [p]ersonality [d]isorder." AR 522. On September 8, 2014, Plaintiff reported feeling "anxious" despite normal findings otherwise. AR 495. On October 8, 2014, Plaintiff was "depressed" and reported experiencing auditory hallucinations despite normal finding otherwise. AR 493. On November 10, 2014, Plaintiff showcased "blunted" affect, "depressed" mood, and "delayed" speech. AR 491. Plaintiff described having problems with his insurance company to approve his recommended dose of medication. *Id*.

On December 15, 2014, Dr. Akindele Kolade, Plaintiff's treating psychiatrist, noted Plaintiff suffered "anxiety," "[d]epression, [b]orderline personality disorder," "[p]anic attacks," and "[b]ipolar disorder." AR 567. Dr. Kolade observed that Plaintiff "[b]ec[ame] fatigued easily" and suffered "[s]leep disturbance issues" as well as "[i]nsomnia." *Id*. "Psychotic symptoms [were]

described or reported," including both auditory and visual hallucinations. *Id*. "[V]oices tell [Plaintiff] to perform self injurious acts. . . . Persecutory delusions are described by [Plaintiff]. Unusual perceptual experiences are reported." AR 568. Dr. Kolade then diagnosed Plaintiff with "[s]chizophrenia" and "[u]nspecified [a]nxiety [d]isorder." AR 569.

On January 9, 2015, Dr. Kolade reported Plaintiff was hearing "wors[e] voices and [experiencing] PTSD symptoms." AR 515. Plaintiff "cannot sleep because of voices[, which] command[ him] to kill [him]self sometimes but not today." *Id*. Plaintiff was "cooperative" and "attentive" in the session and "[h]is reasoning [was] concrete." *Id*. At the same time, Dr. Kolade noted signs of "severe depression" evidenced by Plaintiff's "[b]ody posture," "attitude," "[s]lowness of physical movement," "[s]peech and thinking," and "[f]acial expression and general demeanor"; "flat" affect and mood; "[b]izarre behavior"; "[p]sychotic or borderline psychotic symptoms"; and "fair" insight into problems and social judgment. *Id*. Dr. Kolade recommended immediate psychiatric hospitalization. AR 516.

From January 13, 2015 through January 15, 2015, Plaintiff was hospitalized at Montevista Hospital on referral from Dr. Kolade for treatment of his "depression, anxiety, and suicidal ideation." AR 572. Plaintiff reported "symptoms of depressed mood, anhedonia, low interest, low energy, poor motivation, poor concentration, insomnia, and suicidality. . . . He report[ed] his current medications . . . [were] mostly ineffective for him." *Id*. Upon release on January 16, 2015, Plaintiff told Dr. Kolade that he felt "better than before hospitalization." AR 562.

On February 17, 2015, Plaintiff appeared before Dr. Kolade with anxiety, "sad" demeanor, and, "flat" affect, but otherwise, was "cooperative and attentive with no gross abnormalities." AR 560. "Improvement [was] noted." *Id*. On March 17, 2015, Dr. Kolade reported Plaintiff's "behavior [was] stable and uneventful." AR 558. On April 22, 2015, Dr. Kolade again noted Plaintiff's "[b]ehavior has been appropriate and uneventful." AR 555. On June 1, 2015, Dr. Kolade opined that Plaintiff was "depressed" about "several deaths in the family." AR 553. Specifically, Plaintiff was "[e]motional due to [his] grandmother['s] death." *Id*. Plaintiff reported "[c]ontinued depressive symptoms," "anhedonia," "excessive worrying," and "difficulty thinking." *Id*. On June 23, 2015, Plaintiff "show[ed] minimal apparent treatment response," despite taking medication "regularly."

AR 551. Plaintiff reported difficulty sleeping and thinking, and presented as "glum, flat, sad looking, guarded, disheveled, over weight, [] tense[, and] anxious." *Id*. On July 21, 2015, Dr. Kolade opined that Plaintiff "show[ed] apparent slight treatment response." AR 548. However, Plaintiff reported continued "[d]epressive symptoms," "[i]ncreased symptoms of anhedonia," "less energy than before," "increase[d] . . . excessive worrying," "worsened" symptoms of sadness," and an "increase in . . . sociability difficulties." *Id*. Plaintiff presented as "flat, sad looking, guarded, communicative, disheveled, over weight, [] tense[, and] anxious." *Id*. Dr. Kolade again suggested hospitalization. AR 549.

On October 7, 2015, Dr. Kolade noted Plaintiff was "[l]ess depressed," but had "racing thoughts" and was "drinking more alcohol." AR 546. Plaintiff reported "[d]ifficulty staying asleep," and appeared "sad looking, guarded, disheveled, over weight [sic], and . . . anxious." *Id*. Plaintiff's examination was normal otherwise. On November 5, 2015, Plaintiff "denie[d] all psychiatric problems. Behavior has been appropriate and uneventful." AR 544. On December 22, 2015, Plaintiff reported that he "ran out of his medication for 2 weeks." AR 542. Plaintiff was experiencing "migraine headaches," "generalized malaise," "depression and moodiness," and "[c]ontinued depressive" and "anxiety" symptoms. *Id*. On January 21, 2016, Plaintiff's "behavior [was] stable and uneventful and he denie[d] any psychiatric problems or symptoms. . . . Psychotic, depressive, and anxiety symptoms are denied." AR 540. On March 10, 2016, Plaintiff demonstrated "symptoms of a generalized anxiety disorder. . . . Depressive symptoms are described." AR 538. On April 7, 2016, Dr. Kolade wrote that "Plaintiff has had a slight apparent response to treatment. [Plaintiff] describes depressive symptoms [and] . . . depression." AR 536.

### 2. Emergency Treatment Records

On November 26, 2012 and December 3, 2013, Plaintiff visited the emergency department for his anxiety and suicidal ideation, and for acute depressive symptoms and attempted suicide, respectively. AR 364–73, 387–88, 393. These visits are discussed above.

### 3. Mental Impairment Questionnaire

Dr. Kolade submitted a Mental Impairment Questionnaire (AR 508–13) on September 4, 2015, where he opined that Plaintiff suffers from "schizophrenia," which is "a permanent [d]iagnosis

that will continue to require treatment." AR 508. At the time of the Questionnaire, Plaintiff was prescribed Ambien, Clonazepam, Doxepin, Prozac, Lithium, and Cymbalta. *Id*. Dr. Kolade wrote that Plaintiff was undergoing "therapy and medication management appointments. [Plaintiff h]as been compliant with . . . office visits." *Id*. Dr. Kolade checked off boxes indicating Plaintiff showcased "[a]nhedonia or pervasive loss of interest in almost all activities"; "[d]ecreased energy"; "[g]eneralized persistent anxiety"; "[e]asy distractibility"; and, "[m]emory impairment—short, immediate or long term." AR 509.

Under the "Mental Abilities and Aptitudes Needed to do Unskilled Work" heading, Dr. Kolade checked boxes indicating Plaintiff was unable to meet competitive standards in "maintain[ing] regular attendance and be[ing] punctual within customary, usually strict tolerances"; "work[ing] in coordination with or proximity to others without being unduly distracted"; "mak[ing] simple work-related decisions"; and, "get[ting] along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes."[6] AR 510. Dr. Kolade checked boxes indicating that Plaintiff is "seriously limited, but not precluded" in "[r]emember[ing] work-like procedures"; "[u]nderstand[ing] and remember[ing] very short and simple instructions"; "[c]arry[ing] out very short and simple instructions"; "[m]aintain[ing] attention for two hour segment[s]"; "[s]ustain[ing] an ordinary routine without special supervision"; "[c]omplet[ing] a normal workday and workweek without interruptions from psychologically based symptoms"; "[p]erform[ing] at a consistent pace without an unreasonable number and length of rest periods"; "[a]sk[ing] simple questions or request[ing] assistance"; "[a]ccept[ing] instructions and respond[ing] appropriately to criticism from supervisors"; "[r]espond[ing] appropriately to changes in a routine work setting"; "[d]ealing with normal work stress"; "[b]e[ing] aware of normal hazards and tak[ing] appropriate precautions"; and, "[a]dher[ing] to basic standards of neatness and cleanliness."[7] AR 510–11.

Under the "Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work" heading, Dr. Kolade checked boxes indicating Plaintiff has "[l]imited but satisfactory" mental

---

[6] "*Unable to meet competitive standards* means . . . [a] patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." AR 510.

[7] "*Seriously limited, but not precluded* means ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances." *Id*.

abilities and aptitudes for "[u]nderstand[ing] and remember[ing] detailed instructions"; "[c]arry[ing] out detailed instructions"; "[s]et[ting] realistic goals or mak[ing] plans independently of others"; and, "[d]eal[ing] with stress of semiskilled and skilled work."  AR 511.  Dr. Kolade opined that Plaintiff's ability and aptitude in (i) interacting appropriately with the general public is "[l]imited but satisfactory"; (ii) adhering to basic standards of neatness and cleanliness is "[s]eriously limited, but not precluded"; and, (iii) using public transportation is "[u]nlimited or [v]ery [g]ood."  *Id.*

Finally, under the "Mental Abilities and Aptitudes Needed to do Particular Types of Jobs" heading, Dr. Kolade checked boxes indicating Plaintiff has moderate functional limitation in "restriction of activities in daily living"; "maintain[ing] social functioning"; and, "maintaining concentration, persistence or pace."  AR 512.  Dr. Kolade noted that Plaintiff had "[o]ne or [t]wo" episodes of decompensation within a 12-month period, each of at least two weeks duration.[8]  *Id.*  Dr. Kolade opined that Plaintiff has a "[m]edically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support . . ." and "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home."  *Id.* (internal alteration omitted).  Dr. Kolade estimated that on average, Plaintiff's impairments or treatment would cause him to be absent from work "[a]bout two days per month."  AR 513.  Dr. Kolade checked a box indicating Plaintiff (i) does not have an impairment that has lasted or is expected to last at least twelve months; (ii) is not a malingerer; (iii) has impairments that are "reasonably consistent with the symptoms and functional limitations described in this evaluation"; and, (iv) is not impacted by alcohol or substance abuse.  *Id.*

---

[8]    The Mental Impairment Questionnaire explains that:

"Episodes of decompensation are exacerbation or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two."

AR 512.

1

    **D.**    **Plaintiff's Symptom Testimony**

2

    On examination by ALJ Bennett during the May 5, 2016 administrative hearing, Plaintiff

3

testified that he last worked in 2012. AR 40. Plaintiff testified that he stopped working at that time

4

because his grandfather passed away, and cannot work currently because he "[doesn't] know how

5

to get over the grief. [Plaintiff has] been losing everyone. [Plaintiff hadn't] lost many people . . .

6

until [he] got older. And [Plaintiff doesn't] know how to deal with that." *Id.* When asked by the

7

ALJ if he had "any physical limitations or physical impairments," Plaintiff replied that he can lift

8

"about 20 . . . or 30 pounds" before he begins experiencing back pains. AR 41.

9

    Plaintiff testified that he has been depressed since his grandfather died. AR 42. Following

10

his grandfather's death, Plaintiff "lost [his] grandma, . . . lost [his] other grandpa[, . . . and Plaintiff's]

11

other grandma is dying now." *Id.* Plaintiff testified that he is "not the same anymore" and feels

12

"scary" when he is around people. AR 43. Plaintiff initially stated that "a job where [he doesn't]

13

have to work with other people . . . will work for [him]." *Id.* However, when the ALJ asked Plaintiff

14

to confirm if he "could do a job like that," Plaintiff responded that he "honestly [doesn't] know."

15

*Id.* Plaintiff receives therapy and medication for his concentration problems. *Id.* However, Plaintiff

16

claims that his medication only "helps [him] sometimes, and then . . . it just . . . [doesn't] help." AR

17

44.

18

    Plaintiff testified that he was admitted to the hospital overnight "a few times" for his mental

19

problems. *Id.* Plaintiff described being taken to a hospital via ambulance and being placed on an

20

involuntary 72-hour hold after he tried to commit suicide by cutting his hands with knives.[9] AR 44–

21

45. Upon release from hospitalization, Plaintiff was prescribed medication. AR 45. Plaintiff again

22

stated that his medications will sometimes work for a while, but other times they make him feel "less

23

than normal." AR 45–46. Plaintiff feels more depressed on the days he misses his medications;

24

however, he also claims the medications are "not working for [him. Plaintiff] can't sleep, [and his]

25

stress [and] anxiety don't go away. [Plaintiff is] really aggravated. [Plaintiff is] mean to [his] mom,

26

and [he doesn't] like that." AR 46.

27

28

---

[9]    Plaintiff testified that he was taken to the hospital following a suicide attempt sometime in 2014 (AR 44), but the record shows this hospitalization occurred in December 2013 (AR 388).

1      Plaintiff received disability payments for approximately a year and a half from his previous

2   job until his insurance was cut off because his doctor did not submit the proper paperwork.  AR 46–

3   47.  When ALJ Bennett asked Plaintiff if he had anything else to add to his testimony, Plaintiff

4   mentioned he was molested as an adolescent starting from when he was five years old.  AR 48.  After

5   his grandfather passed away in 2011, Plaintiff "tried to push [himself] into work" and worked up to

6   2013.  AR 48.  Plaintiff "worked for [his] family.  [Plaintiff] tried to help them with what [he] could

7   for as long as [he] could, and [he] couldn't do it anymore.  [Plaintiff] did try.  [He] tried, [he] tried,

8   and [he] tried."  AR 49.  Currently, Plaintiff "can't even come out of [his] room. . . . Maybe twice

9   a week, [he will] come out – maybe twice every two weeks, [he will] come out of [his] room.

10  [Plaintiff doesn't] want to be around nobody [sic]."  Id.

11     On examination by his attorney, Plaintiff testified that he first visited Dr. Kolade in January

12  2015.  AR 49.  At that time, Plaintiff "was hearing voices"; "[Plaintiff's] anxiety was bad and [his]

13  medication wasn't working."  AR 50.  Plaintiff's insurance was cut off so he did not have his

14  medications, although Plaintiff was "working on getting Obamacare."  Id.  When Plaintiff has his

15  medication, he does not hear voices.  Id.  Plaintiff was in inpatient care for: (i) three days in

16  November 2012; (ii) four days in February 2013; and, (iii) and a week at Summerlin Hospital in

17  December 2013, where he was diagnosed with "panic disorder with agoraphobia."  AR 50–51.

18  Plaintiff suffers from panic attacks "[t]wice a week," which last anywhere from "30 to 40 minutes .

19  . . [to] a couple days."  Id.  Plaintiff's panic attacks persist over a period of several days about "twice

20  a month."  Id.  Although Plaintiff's doctor has tried to prescribe him more medication, Plaintiff's

21  insurance will not cover an increased regimen.  AR 52.  Plaintiff has been on six different

22  combinations of medications throughout his lifetime.  Id.  Plaintiff generally adheres to his

23  medication regimen; however, he will sometimes skip a dose of medication when he has trouble

24  sleeping, and he has gone for a week without taking medication when he did not have insurance.

25  AR 52–53.  Plaintiff testified that living with his parents sometimes triggers his panic attacks,

26  because his dad used to abuse his mom.  AR 53.  "[Plaintiff] remember[s] having to sit in front of

27

28

[his] mom so [his dad] didn't beat her and having to call the police and run to the neighbors' house and call my grandpa." *Id*. Plaintiff used to possess a medical marijuana card, but "[marijuana] didn't work for [him]." AR 53–54.

**E.      Vocational Expert Testimony**

VE Davis testified that Plaintiff previously held three jobs that qualified as past relevant work. AR 54–55. First, VE Davis stated that Plaintiff's past relevant work at Buffalo Bills had two components, each consisting of "[l]ight physical exertion [and] unskilled [work]": "[r]ide attendant" (DOT number 342.677-010) and "cashier" (DOT number 211.462.010). AR 54. Second, VE Davis testified that Plaintiff held past relevant "[l]ight physical exertion [and] unskilled" work as a store manager (DOT number 185.167-046). *Id*. Finally, VE Davis noted that Plaintiff's past relevant work at his "stocking job" had two components, one consisting of "[l]ight physical exertion [and] unskilled [work]" as a "[s]tock supervisor" (DOT number 921.133-018), and the other consisting of "heavy, semi-skilled, although as performed it probably was medium, semi-skilled" work as a "stock clerk" (DOT number 299.367-014). AR 54–55.

ALJ Bennett then asked VE Davis to assume a hypothetical individual that included a person that:

> can lift 20 pounds occasionally, 10 pounds frequently. This person can stand and walk up to six in eight; six up to six in eight with occasional postural limitations[,] [] all [] this person would be relegated to simple, repetitive tasks, and also, this person would have . . . to have a situation where there would be only occasional contact with supervisors, coworkers, and the general public.

AR 55. Before responding to ALJ Bennett's question, VE Davis noted that Plaintiff's previous work as a "cashier and the ride attendant had frequent or continuous contact with people. It was very superficial contact. It wasn't any major interaction of any challenging nature." *Id*. Despite this, VE Davis decided to eliminate these past jobs because they involve contact with others "more than

occasional[ly] or four hours a day." *Id*. VE Davis testified that the foregoing hypothetical person could work as a "fast-food worker," DOT 311.472-010; "assembler in a light industrial setting," DOT 729.687-010; and, "mail clerk," DOT 209.687-026.[10] AR 56–57.

On examination by Plaintiff's attorney, VE Davis was asked if there is any past work or other work a person could perform if:

> a person, at any functional capacity level, 26 to 49 percent of the time . . . [is] unable to maintain regular attendance and be punctual for work, unable to work in coordination with or proximity to others, unable to make simple work-related decisions, and unable to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes.

AR 57. VE Davis stated there is no such past work or other work a person could perform under this scenario, adding that this hypothetical "sound[ed] similar to what [ALJ Bennett] said in the previous one except they're more limiting. It sounds like [Plaintiff's counsel is] saying unable to be with public; [ALJ Bennett] said occasional public" contact is sufficient. AR 57. Plaintiff's counsel told VE Davis that Plaintiff's doctor opined he would "miss two days a month" of work. AR 58. VE Davis said this number of unexcused absences "would be . . . just over what would be tolerated by most employers." *Id*.

**F.    Plaintiff's Lay Witness Testimony**

Plaintiff's mother, Judy Gutierrez, submitted a Third Party Function Report on May 19, 2014 attesting to the following observations. AR 288–95. "[U]nder Dr's orders[, Plaintiff] cannot work right now[.] Mark is [h]aving [i]ssues w/ b[i]polar [disorder,] anxiety[, and] stress." AR 288. Plaintiff "stay[s] in his [r]oom [a]ll [d]ay." AR 289. Plaintiff "[d]oes not [l]like to dress or [c]hange [c]lothes," has to be reminded to bathe, does not like to cut or comb his hair, "[d]oes not care" about shaving, and "will forget to eat." *Id*. Plaintiff does no household chores, and "[a]t times will put clothes in [the] washer then forget [about them]." AR 290. Plaintiff does not do house or yard work because "voices in [his] head tell[] him to stay in his room." AR 291. Plaintiff does not go outside because of his "[d]epression" and "[a]nxiety." *Id*. Plaintiff shops in stores every two to three weeks

---

[10]    VE Davis conceded that a fast-food worker would be "around a lot of people," but he would be "working with things, particularly in the back. . . . [A fast-food worker is] putting dressings on sandwiches or . . . working the fryer . . . putting condiments on, . . . [and] assembling sandwiches. . . . [The fast food worker occupation] is simple, repetitive." AR 56.

for "fruits[,] vegetables[, and j]uice water." *Id*. Plaintiff is unable to manage any of his financial responsibilities, including paying bills or handling a savings account. *Id*. Plaintiff "[c]an[]not be around a lot of people [because he b]reaks out [in a] cold sweat[ and] experiences chest pain [b]ecause of [his] anxiety." AR 292. Plaintiff does not go anywhere on a regular basis, apart from his monthly doctor's appointments. *Id*. When Plaintiff leaves his house, he needs his mother, brother, or father to accompany him. *Id*. Plaintiff "used to go out shopping[ and] visit[] people [and] friends [but] now [h]e has [c]hanged [d]ramatically." AR 293. Ms. Gutierrez checked "[l]ifting," "[s]quatting," "[b]ending," "[s]itting," "[k]neeling," "[t]alking," "[m]emory," "[c]ompleting [t]asks," "[c]oncentration," "[u]nderstanding," "[f]ollowing [i]nstructions," and "[g]etting [a]long [w]ith [o]thers" all as abilities affected by Plaintiff's alleged disability. *Id*. Plaintiff's mother stated that Plaintiff has "2 [d]islocated [d]iscs[,] can [l]ift only up to 10 lbs[,] and walk for like 20 min"; Plaintiff can walk a half of a block before needing to stop and rest; and, Plaintiff can pay attention for three minutes at a time. *Id*. When Plaintiff has a change in routine, he "sleeps his [d]ay away." AR 294. When walking, Plaintiff uses a knee splint that was prescribed by a doctor two years ago. *Id*. Plaintiff is prescribed clonazepam for his anxiety; mirtazapine for insomnia; Zoloft for his depression; Abilify and quetiapine fumarate (i.e., Seroquel) for his depression and anxiety; and, divalproex sodium for his bipolar disorder. AR 295.

**G.    Issues Presented**

Plaintiff contends the ALJ erred by improperly: (1) rejecting medical documentation establishing that Plaintiff's mental impairments meet or equal Listing 12.04 (ECF No. 12 at 11:17–13:4); (2) according little weight to Plaintiff's treating physician's opinion (*id*. at 13:4–15:5); (3) providing a deficient credibility determination (*id*. at 16:1–18:18); (4) rejecting Plaintiff's lay witness testimony (*id*. at 18:19–19:23); and, (5) basing his step five finding on unsubstantiated evidence (*id*. at 19:24–20:22).

**1.    Depressive Syndrome and Bipolar Disorder as Defined under Listing 12.04**

At step three, the ALJ must determine if a claimant's impairments meet or equal a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The Listing of Impairments "describes each of the major body systems impairments [which are considered] severe enough to

prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience."  20 C.F.R. §§ 404.1525, 416.925.  To meet a listed impairment, a claimant must establish that he meets each characteristic of a listed impairment relevant to his claim.  20 C.F.R. §§ 404.1525(d), 416.925(d).  If a claimant meets the listed criteria for disability, he will be found to be disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "Listed impairments set . . . strict standards because they automatically end the five-step inquiry, before functional capacity is even considered."  *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013).  Accordingly, the claimant bears the burden of establishing he meets a listing.  *Burch*, 400 F.3d at 683.

"The listings for mental disorders are arranged in 11 categories," one of which is Listing 12.04, constituting "depressive, bipolar and related disorders."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.  Listing 12.04 has "three paragraphs, designated A, B, and C; [the claimant's] mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C."[11]  *Id.*

---

[11]    The Regulations explain that:

Paragraph A of each listing (except 12.05) includes the medical criteria that must be present in [the claimant's] medical evidence.

Paragraph B of each listing (except 12.05) provides the functional criteria [the Social Security Administration, or "SSA"] assess[es], in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how [the claimant's] mental disorder limits [his or her] functioning.  These criteria represent the areas of mental functioning a person uses in a work setting.  They are:  understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  [The SSA] will determine the degree to which [the claimant's] medically determinable mental impairment affects the four areas of mental functioning and [his or her] ability to function independently, appropriately, effectively, and on a sustained basis (see 404.1520a(c)(2) and 416.920a(c)(2) of this chapter).  To satisfy the paragraph B criteria, [the claimant's] mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.  (When [the SSA] refer[s] to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, [the SSA] mean[s] the criteria in paragraph B of every listing except 12.05.)

Paragraph C of listing[] . . . 12.04 . . . provides the criteria [the SSA] use[s] to evaluate "serious and persistent mental disorders."  To satisfy the paragraph C criteria, [the claimant's] mental disorder must be "serious and persistent"; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2 (see 12.00G).  (When [the SSA] refer[s] to "paragraph C" or "the paragraph C criteria" in the introductory text of this body system, [the SSA] mean[s] the criteria in paragraph C of listings 12.02, 12.03, 12.04, 12.06, and 12.15.)

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.

Here, the ALJ determined that:

> The severity of the claimant's mental impairments, considered singly and in combination, has not met or equaled the criteria of listings 12.04 and 12.06. In making this finding, I have considered whether the "paragraph B" criteria are [sic] satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> [I]n activities of daily living, the claimant has no restrictions. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. [T]he claimant has experienced no episodes of decompensation, which have been of extended duration.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> [ALJ Bennett] also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.
>
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation [ALJ Bennett] found in the "paragraph B" mental function analysis.

AR 16–17.

Defendant argues that "[a]t best, . . . Plaintiff shows . . . he satisfied only one of the required three Paragraph A criteria . . . [which] alone extinguishes Plaintiff's Listing argument."[12] ECF No. 15 at 6:3–4. In contrast to Defendant's argument, Plaintiff's treating physician, Dr. Kolade,

---

[12]    According to Defendant:

Paragraph A [of Listing 12.04, effective January 17, 2017] requires that a claimant provide medical documentation of three or more of the following [as to bipolar disorder]: (a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased need for sleep; (e) distractibility; (f) involvement in activities that have a high probability of painful consequences that are not recognized; and/or (g) increase in goal directed activity or psychomotor agitation.

ECF No. 15 at 5:17–21. Defendant argues that "only the bipolar disorder criteria under Listing 12.04 apply here . . . [b]ecause Plaintiff did not have the severe impairment of depressive disorder." *Id.* at 5 n. 3.

"reported [on his September 4, 2015 Medical Impairment Questionnaire] that Plaintiff experienced the following symptoms: distractibility, decreased energy, generalized persistent anxiety, memory impairment, anhedonia, and loss of interest in most activities."  *Id*. at 5:23–25 (internal citation omitted).    According to Defendant, however, "only one of these alleged symptoms, i.e., distractibility, qualifies as Paragraph A criteria under Listing 12.04." *Id*. at 6:1–2 (internal alteration and citation omitted).   Additionally, Defendant argues that "Dr. Kolade specifically declined to report symptoms that would satisfy the remaining Paragraph A criteria of Listing 12.04" on his Mental Impairment Questionnaire.  *Id*. at 6:5–6 (internal citations omitted).  Defendant further states that Dr. Kolade "checked off a box [indicating] distractibility, [but] specifically left blank the check boxes for pressured speech, flight of ideas . . . , inflated self-esteem, decreased need for sleep, psychomotor agitation . . . , and activities that have a high probability of painful consequences." *Id*. at 6:9–13 (internal citations omitted).

Defendant also claims Plaintiff "failed to show he satisfied the Paragraph B criteria of 12.04. . . . In fact, Dr. Kolade also indicated, by omission, that Plaintiff did not satisfy these criteria . . . . Dr. Kolade specifically declined to mark pre-printed checkboxes showing symptoms in social interactions and concentration."[13] *Id*. at 6:15, 18–21 (internal citations omitted).  Finally, Defendant argues that Plaintiff's generalized discussion regarding his alleged level of mental functioning is insufficient because "claimants must equal each criterion of a Listing rather than rely on overall functional impact."  *Id*. at 6:23–26, *citing Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

Plaintiff counterargues that his "claim was filed in 2014 . . . well prior to the mental listings being revised, and . . . the ALJ [correctly] relied on the old version of the mental listings in deciding

---

[13]      Paragraph B of Listing 12.04, effective January 17, 2017, requires the claimant to demonstrate: Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning . . . :
1.  Understand, remember, or apply information . . . [;]
2.  Interact with others . . . [;]
3.  Concentrate, persist, or maintain pace . . . [; and/or]
4.  Adapt or manage oneself . . . [.]

this claim."[14]  ECF No. 17 at 2:7–8.  Defendant's "discussion of Listing 12.04 in [its] Response is based largely on the revised version of the Listing published by the agency in 2017," and therefore, "the Commissioner's discussion is not consistent with the standards upon which the ALJ based his decision."  ECF No. 17 at 3:19–20, 21–23.  Further, Plaintiff maintains his impairments represent marked restrictions in the areas of social functioning and in maintaining concentration, persistence, or pace under Paragraph B of Listing 12.04 because Dr. Kolade opined in his Mental Impairment Questionnaire that:

---

[14]    According to Plaintiff, the version of Listing 12.04 the ALJ relied on provides, in part:

12.04  Affective Disorders:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. Decreased energy; or
f. Feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions or paranoid thinking; or
2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking; or
OR
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

ECF No. 17 at 2:13–25, *citing* 20 C.F.R. § 404, Subpt. P, App. 2, Listing 12.04 (eff. until Jan. 16, 2017).

- "Plaintiff's diagnoses included borderline personality disorder and schizophrenia, with a GAF score of 30" (ECF No. 12 at 12:5–6; ECF No. 17 at 2:26–27);

- "Plaintiff's symptoms included decreased energy, generalized, persistent anxiety, easy distractibility, memory impairment, anhedonia, and loss of interest in most activities" (ECF No. 12 at 12:8–10; ECF No. 17 at 3:1–3) (internal citation omitted); and,

- "Plaintiff was unable to meet competitive standards in the categories of maintain regular attendance and being punctual within customary tolerances, working in coordination with or in proximity to others without being unduly distracted, making simple work related decisions, and getting along with coworkers without unduly distracting them or exhibiting behavioral extremes." (ECF No. 12 at 12:11–15; ECF No. 17 at 3–7).

Considering the parties' respective arguments, the Court finds Plaintiff's arguments prevail with respect to Defendant's erroneous reliance on a 2017 revised Listing. That is, Plaintiff's claim was filed in 2014. As such, the ALJ properly relied on the version of Listing 12.04 effective through January 16, 2017. In order to satisfy Paragraph A under this Listing, Plaintiff was required to produce medical documentation of at least four symptoms of depressive syndrome (*see* n.14), or at least three symptoms of manic syndrome (*id.*). Alternatively, Plaintiff could satisfy Paragraph A by providing medical documentation of "[b]ipolar syndrome . . . [which, at the time of the Listing relied on by the ALJ, was] characterized by either [depressive or manic syndrome] or both syndromes." *Id.* In order to satisfy Paragraph B under this Listing, Plaintiff was required to show that his syndrome(s) resulted in at least two consequences described therein. *Id.* Defendant's discussion of the 2017 revised Listing is therefore irrelevant.

a.    Plaintiff satisfied Paragraph A of Listing 12.04.

Plaintiff has carried his burden of demonstrating that his symptoms meet the requirements of Paragraph A.1 for depressive syndrome and Paragraph A.3 for bipolar syndrome under Listing 12.04. As for depressive syndrome, Dr. Kolade checked boxes on the Mental Impairment Questionnaire indicating Plaintiff demonstrated: "[a]nhedonia or pervasive loss of interest in almost all activities" (AR 509); "[d]ecreased energy" (*id.*); and, difficulty concentrating or thinking, or "[e]asy distractibility" (*id.*). This demonstrates that Plaintiff met three Paragraph A.1 criteria (*see* n.14) and, as detailed below, Dr. Kolade's treatment notes confirm four more Paragraph A.1 criteria. Dr. Kolade's treatment notes consistently indicate that Plaintiff experienced "anhedonia" (AR 548,

553); "sleep disturbances" (AR 515, 546, 551, 567); "decreased energy" (AR 548, 567); "difficulty thinking" (AR 551, 553); and, "hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process" (AR 515, 536, 538, 548, 551; *see also* AR 567–68). Plaintiff reported disturbances in his sleep (AR 376, 481, 483, 522) and decreased energy (AR 376, 481, 483) during multiple IOP visits.[15] Plaintiff not only exhibited "anhedonia and isolation from friends" during his time in inpatient care, but he also "lost about 25 pounds due to poor appetite," which equates to an "appetite disturbance with change in weight." AR 374. Plaintiff reported symptoms of "anhedonia" and "low interests"; "low", or decreased energy; "insomnia;" and, "suicidality" to his attending physician at Montevista Hospital. AR 572. Additionally, Plaintiff was "hospitalized for treatment of severe depression and suicidal ideation at least four times between 2012 and 2015" (ECF No. 12 at 12:23–24, *citing* AR 374–75, 376–77, 412, 572). In sum, although Plaintiff was only required to produce medical documentation of four symptoms of depressive syndrome to meet the requirements of Paragraph A.1 under Listing 12.04, Plaintiff provided documentation of at least seven of the nine symptoms. Further, Plaintiff not only provided medically documented persistence of depressive syndrome, but he also provided documentation of bipolar syndrome because the version of the Listing on which the ALJ relied characterized bipolar syndrome as either depressive or manic syndrome, or both.[16] Therefore, Plaintiff sufficiently satisfied Paragraph A of Listing 12.04.

---

[15]    The Regulations in effect at the time of the filing of Plaintiff's claim state that "[i]nformation from the individual" is an acceptable source of medical documentation, because "[i]ndividuals with mental impairments can often provide accurate descriptions of their limitations." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00.D.1.b.

[16]    The Court finds Plaintiff submitted medical documentation of two of the following symptoms of manic syndrome: "[e]asy distractibility" (AR 509) and "[h]allucinations, delusions or paranoid thinking" (AR 515, 536, 538, 548, 551; 567–68). Plaintiff therefore fell short of providing three symptoms of manic syndrome required to satisfy Paragraph A.2 of Listing 12.04. Notwithstanding, Plaintiff submitted medical documentation of at least seven of nine symptoms of depressive syndrome, which also characterized bipolar syndrome at the time of the ALJ's decision.

b.    Plaintiff satisfied Paragraph B of Listing 12.04.

Plaintiff produced medical documentation of two consequences of depressive syndrome and/or bipolar disorder necessary to satisfy Paragraph B under Listing 12.04, including: (1) marked restriction of activities of daily living, and (2) marked difficulties in maintaining social functioning.[17] Plaintiff's statements at his mental status examination, testimony at the administrative hearing, and lay witness testimony demonstrate marked restriction of activities of daily living.[18]  At his psychiatric evaluation, Plaintiff told Dr. Browning that: he "lay[s] in a room, star[es] at walls, watch[es] TV, and forget[s] to eat" (AR 382), does not do any household chores, except once per month "when manic" (*id.*), and has "no outside activities or hobbies" (*id.*).  At his administrative hearing, Plaintiff testified that he "can't even come out of [his] room . . . .  Maybe twice a week, [Plaintiff will] come out – maybe twice every two weeks."  AR 49.  Plaintiff's mother submitted a Third Party Function Report stating that Plaintiff does not do household chores (AR 290), do house or yard work because "voices in [his] head tell[] him to stay in his room" (AR 291), go outside because of his "[d]epression" and "[a]nxiety" (*id.*), and go anywhere on a regular basis, apart from his monthly doctor's appointments (*id.*).  This evidence plainly contradicts the ALJ's finding of "no restrictions" in Plaintiff's activities of daily living.  AR 16.

Plaintiff also provided medical documentation of marked difficulties in maintaining social functioning.  Dr. Kolade opined that Plaintiff was "unable to meet competitive standards in the categories of maintaining regular attendance and being punctual within customary tolerances, working in coordination with or in proximity to others without being unduly distracted, making simple work related decisions, and getting along with coworkers or peers without unduly distracting

---

[17]    Whether Plaintiff provided sufficient medical documentation of marked difficulties in maintaining concentration, persistence, or pace is unclear.  On one hand, Plaintiff self-reported problems concentrating in his hospital visits.  AR 481, 572.  On the other hand, "Dr. Kolade specifically declined to mark pre-printed checkboxes showing symptoms in . . . concentration [i.e., "[d]ifficulty thinking or concentrating]" (ECF No. 15 at 6:20–21, *citing* AR 21–22, 509), and Dr. Browning found Plaintiff was only "mildly to moderately impaired in his ability to maintain concentration" (AR 383).  The Court need not address this issue, however, because Plaintiff was only required to—and did—provide two consequences of bipolar disorder to satisfy Paragraph B of Listing 12.04.

[18]    *Supra*, n.14; *see also* 20 C.F.R. § 404, Subpt. P, App. 1, 12.00.D.4 (providing that the mental status examination is a source of medical documentation), 12.00.D.1.c. ("If necessary, information should also be obtained from nonmedical sources, such as family members and others who know you, to supplement the record of your functioning in order to establish the consistency of the medical evidence and longitudinally of impairment severity").

them or exhibiting extremes."[19] ECF No. 12 at 12:11–15, *citing* AR 510. Dr. Kolade noted that, on average, Plaintiff's impairments or treatment would cause him to be absent from work about "two days per month." AR 513. Moreover, Dr. Browning opined that Plaintiff is "moderately to severely impaired in his ability to interact appropriately with the public." AR 383. Plaintiff's mother stated that Plaintiff: "[c]an[]not be around a lot of people [because he b]reaks out [in a] cold sweat[ and] experiences chest pain" due to his anxiety (AR 292), "needs his mother, brother, or father to accompany him" if he goes outside his house (*id.*), and "used to go out shopping[ and] visit[] people [and] friends [but] now [h]e has [c]hanged [d]ramatically" (AR 293). Accordingly, Plaintiff satisfied the requirements of Paragraph B of Listing 12.04.

      c.    <u>Plaintiff met the required level of severity for depressive syndrome and bipolar disorder because he met the requirements of both Paragraph A and B of Listing 12.04.</u>

Because Plaintiff satisfied the requirements of both Paragraph A and B of Listing 12.04, the ALJ should have found Plaintiff disabled under the Act.[20] On the basis of this error alone, the Court may remand this case for an immediate award of benefits. 20 C.F.R. §§ 404.1520(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), [the Commissioner] will find you disabled without considering your age, education, and work experience."), 416.920(a)(4)(iii); *Kennedy*, 738 F.3d at 1176. However, the Court considers additional reasons that a remand for further proceedings is appropriate in this case.

---

[19]    Defendant asserts that "Dr. Kolade specifically declined to mark pre-printed checkboxes showing symptoms in social interactions," but a review of the page cited shows no such checkbox exists. ECF No. 15 at 6:20–21, *citing* AR 21–22, 509.

[20]    The Court's analysis is limited to discussing whether Plaintiff met the requirements of Paragraph A and B under Listing 12.04. Plaintiff has not provided medical documentation necessary to satisfy Paragraph C, which requires:

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.04.C (eff. until Jan. 16, 2017).

1

2. **Plaintiff's Treating Physician's Opinion**

2      In accordance with the Social Security regulations, the courts have "developed standards that

3  guide our analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528

4  F.3d 1194, 1998 (9th Cir. 2008) (internal citation omitted).  Courts "distinguish among the opinions

5  of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who

6  examine but do not treat the claimant (examining physicians); and (3) those who neither treat nor

7  treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

8  As a general rule, "greater weight should be given to a treating physician's opinion because 'he is

9  employed to cure and has a greater opportunity to know and observe the patient as an individual.'"

10  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989), *citing Sprague v. Brown*, 812 F.2d 1226,

11  1230 (9th Cir. 1987).  "The treating physician's opinion is not, however, necessarily conclusive as

12  to either a physical condition or the ultimate issue of disability.  . . . The ALJ may disregard the

13  treating physician's opinion whether or not that opinion is contradicted."  *Id.* (internal citations

14  omitted).  If the treating physician's opinion on the nature and severity of the claimant's impairment

15  is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not

16  inconsistent with other substantial evidence in the case record, it will be given controlling weight.

17  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p (same).  For claims filed before March 27,

18  2017, as is the case here, "the opinion of a treating physician is [given] greater weight than that of

19  an examining physician, [and] the opinion of an examining physician is entitled to greater weight

20  than that of a nonexamining physician."  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014)

21  (internal citation omitted); *see also* 20 C.F.R. §§ 404.1527, 416.92.

22      "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the

23  ALJ may only reject it by providing specific and legitimate reasons supported by substantial

24  evidence."[21]  *Garrison*, 759 F.3d at 1012 (internal citation omitted).  "This is so because, even when

25  contradicted, a treating or examining physician's opinion is still owed deference and will often be

26  ─────────────────────

[21]      Plaintiff refers to the "clear and convincing" reason standard that the ALJ employs in analyzing an
27  uncontradicted treating or examining physician's opinion. ECF No. 12 at 14:25–15:5, *citing Lester*, 81 F.3d at 830–31.
   However, because Plaintiff's treating physician's opinion is contradicted by the nontreating sources' opinions, the ALJ
28  was only required to provide "specific and legitimate" reasons supported by substantial evidence before rejecting Dr.
   Kolade's opinion. *Lester*, 81 F.3d at 830–31.

'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*, *citing Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). Further, under the specific and legitimate reasons standard, the ALJ may disregard a treating physician's opinion when it is premised on the claimant's own subjective complaints. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989). To satisfy the "substantial evidence" requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretations thereof, and mak[e] findings." *Garrison*, 759 F.3d at 1012, *citing Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Id.* (internal citation and quotation marks omitted). The ALJ can never arbitrarily substitute his own judgment over the opinion of competent medical professionals. *Tackett*, 180 F.3d at 1102–03.

Here, the ALJ provided three reasons for attributing "little weight" to the opinion of Plaintiff's treating physician, Dr. Akindele Kolade: (a) "Dr. Kolade expressly stated that Plaintiff did not meet the Act's 12-month duration requirement" (ECF No. 15 at 7:8–9, *citing* AR 21, 508–13); (b) "Dr. Kolade's report was internally inconsistent" (*id.* at 7:17–18, *citing* AR 21, 510–11); and, (c) "Dr. Kolade's own treatment records failed to support—and actually contradicted—his assessment of debilitating functional limitations." (*id.* at 8:5–6, *citing* AR 21, 536, 538). The Court examines each of the ALJ's findings below.

### a. The ALJ properly considered Dr. Kolade's opinion to the extent it stated Plaintiff did not meet the Act's 12-month duration requirement.

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Dr. Kolade submitted a Mental Impairment Questionnaire in which he checked "no" in response to a question asking whether Plaintiff's "impairment lasted or [is] expected to last at least twelve months." AR 513. Notably, Plaintiff does not contest his treating physician's finding of nondisability in either his opening brief or his reply brief. The ALJ therefore properly considered

Plaintiff's treating physician's opinion and did not commit an error to the extent it found Plaintiff's symptoms had not, and would not, last long enough to make him eligible for disability benefits under the Act.[22]

        b.    <u>Dr. Kolade's Mental Impairment Questionnaire was internally inconsistent with respect to the mental abilities and aptitudes necessary to perform unskilled, semiskilled, and skilled work, but this was not a specific and legitimate basis for the ALJ to reject the treating physician's opinion as a whole.</u>

An ALJ may reject opinions that are internally inconsistent. *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). Here, the ALJ found Dr. Kolade's Mental Impairment Questionnaire was internally inconsistent because it "indicated that the claimant was seriously limited in carrying out short instructions, yet was able to satisfactorily understand, remember, and carry out detailed instructions." AR 21, *citing* AR 510–11. To be more precise, Dr. Kolade checked boxes indicating Plaintiff's abilities in "[c]arry[ing] out very short and simple instructions" and "[m]aintain[ing] attention for two hour segment[s]" were "seriously limited, but not precluded" for unskilled work, but at the same time checked boxes indicating Plaintiff's abilities in "[c]arry[ing] out detailed instructions" and "[u]nderstand[ing] and remember[ing] detailed instructions" were "[l]imited but satisfactory" for semiskilled and skilled work. AR 510–11. This discrepancy makes little sense. Logic, as well as the record from Dr. Kolade as a whole, dictates that if Plaintiff is seriously limited in his ability to perform a set of skills for unskilled work on the one hand, he cannot plausibly be able to satisfactorily perform the same set of skills for more demanding semiskilled and/or skilled work on the other hand. The ALJ therefore properly accorded little weight to Plaintiff's treating physician's contradictory opinion with respect to the mental abilities and aptitudes required to perform unskilled, semiskilled, and skilled work.[23]

---

[22]    On January 15, 2020, the Court ordered Plaintiff to obtain clarification from Dr. Kolade regarding this issue because his indication that Plaintiff's impairment is not expected to last at least 12 months seemed inconsistent with the doctor's overall treatment notes. ECF No. 20. On February 10, 2020, Plaintiff filed a response to this Order, and attached a Medical Impairment Questionnaire completed by Dr. Kolade on February 4, 2020, in which the doctor did not change this indication. ECF No. 25-1. Notwithstanding, the Court finds remand of this case for further proceedings remains appropriate for the reasons stated below.

[23]    The Court's January 15, 2020 Order, referenced in the previous footnote, asked Plaintiff to obtain clarification from Dr. Kolade regarding this issue as well. ECF No. 20. Notwithstanding Dr. Kolade's substantially identical February 4, 2020 Medical Impairment Questionnaire, the Court finds remand of this case for further administrative proceedings appropriate for the reasons below.

1    Notwithstanding, this discrepancy was not a specific and legitimate reason to accord little

2    weight to Dr. Kolade's opinion *as a whole* as the remainder of Dr. Kolade's opinions are consistent

3    with the overall diagnostic picture provided by his treatment notes.  *Holohan v. Massanari*, 246 F.3d

4    1195, 1205 (9th Cir. 2001) (requiring the ALJ to read a medical opinion in full and in the context of

5    the entire record); *Nguyen*, 100 F.3d at 1465 ("Where the purported existence of an inconsistency is

6    squarely contradicted by the record, it may not serve as the basis for the rejection of an examining

7    physician's conclusions.").

8         c.   Dr. Kolade's treatment records support his assessment of debilitating
          functional limitations.
9

10   Factors used when evaluating a medical opinion include the amount of relevant evidence that

11   supports the opinion, the quality of the explanation provided in the opinion, and the consistency of

12   the medical opinion with the record as a whole.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th

13   Cir. 2007); *Orn*, 495 F.3d at 631.  A physician's opinion may be rejected if it is unsupported by the

14   physician's treatment notes.  *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003).  Put another

15   way, incongruity between a doctor's medical opinion and treatment records or notes is a specific and

16   legitimate reason to discount a doctor's opinion.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th

17   Cir. 2008).  This is because a provider's observations must be "read in the context of the overall

18   diagnostic picture" the provider draws.  *Holohan*, 246 F.3d at 1205.

19   Defendant portrays Dr. Kolade's treatment records as inconsistent with his assessment of

20   debilitating functional limitations.  "The ALJ noted that while Dr. Kolade found Plaintiff had a GAF

21   score of 30, indicating delusions, hallucinations, or serious impairments in communication or

22   judgment, Dr. Kolade's treatment records showed on several occasions that Plaintiff had logical and

23

24

25

26

27

28

appropriate thought processes with no psychotic symptoms."[24]  ECF No. 15 at 8:10–14, *citing* AR 22, 536, 538.  Defendant's characterization of Dr. Kolade's overall diagnostic picture is at best, incomplete, and at worst, a misstatement of fact.  The treatment records the ALJ references, but fails to discuss in his findings, include:

- "[Plaintiff's i]nsight into problems appear to be poor" (AR 536);

- "[Plaintiff's j]udgment appears to be poor" (*id*.);

- "There are signs of anxiety" (*id*);

- "Symptoms of anxiety are present.  [Plaintiff] has symptoms of a generalized anxiety disorder.  [Plaintiff] continues to exhibit symptoms of a generalized anxiety disorder.  Depressive symptoms are described.  Symptoms of depression continue as described" (AR 538);

- "[Plaintiff's] self care is reduced and less attention is being paid to these tasks.  His relationships with family and friends have ceased" (*id*.);

- "[Plaintiff] appears flat, downcast, minimally communicative, casually groomed, over weight, and tense. [sic] and appears anxious" (*id*.); and,

- "[Plaintiff's d]emeanor is sad.  Signs of moderate depression are present" (*id*.).

Importantly, Dr. Kolade diagnosed Plaintiff with "[s]chizophrenia" and "[u]nspecified [a]nxiety [d]isorder" in both of the above-referenced treatment records.  AR 536, 538.

Despite this evidence, Defendant argues that "on January 9, 2015, Dr. Kolade stated Plaintiff's behavior suggested auditory hallucinations yet, at the same time, Dr. Kolade found Plaintiff was cooperative, attentive, had no gross behavior abnormalities, and denied suicidal ideations."  ECF No. 15 at 8:14–17, *citing* AR 22, 515.  These statements are not inconsistent when Dr. Kolade's overall observations at this treatment session are reviewed.  These include:

---

[24]     While a GAF score may help guide an ALJ's decision, an ALJ is not bound to consider a GAF score.  The Commissioner has explicitly disavowed use of GAF scores as indicators of disability.  65 Fed. Reg. 50746-01, 50765 (Aug. 21, 2000).  Further, the GAF scale is no longer included in the DSM–V.  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* at 16 (5th ed. 2013).  Here, the ALJ listed the GAF score of 30 as a reason to discount Dr. Kolade's opinion as it was "inconsistent with the symptoms Dr. Kolade described in [his] treatment notes" on the one hand, but found "in the next paragraph . . . [that] GAF scores were generally of limited evidentiary value" on the other.  ECF No. 12 at 13:7–9, *citing* AR 22.  Plaintiff argues that "the GAF score of 30 is entirely consistent with Plaintiff's symptoms as described in Dr. Kolade's treatment notes, including a preoccupation with suicide and rarely leaving the house, having a job, or socializing."  ECF No. 17 at 4:21–23.  The Court finds the ALJ erred in discounting the use of GAF scores, and then relying on the scores to make a finding that Dr. Kolade was inconsistent.  If the ALJ declined to consider Plaintiff's GAF score, he should have done so indiscriminately, and not relied on the figure elsewhere to support his finding of inconsistency.  Indeed, contrary to Defendant's allegations, and as discussed further below, Dr. Kolade's treatment records supported his assessment of debilitating functional limitations.

- "[W]orst voices and PTSD symptoms , cannot sleep because of voices[]. Voices commanding to kill self sometimes but not today[]. Sad and depressed" (AR 515);

- "[Plaintiff] presents as flat, glum, sad looking, guarded, downcast, minimally communicative, disheveled, over[]weight, and appears anxious.  [sic] and tense" (*id*.);

- "Demeanor is sad.  There are signs of severe depression" (*id*.);

- "Slowness of physical movement helps reveal depressed mood.  Speech and thinking appear slowed by depressed mood.  Facial expression and general demeanor reveal depressed mood" (*id*.);

- "[Plaintiff's] affect is flat.  His affect is congruent with mood" (*id*.); and,

- "Behavior suggests that auditory hallucinations are being experienced. Paranoid ideas are expressed.  A paranoid manner and other signs of paranoid process are present. . . . Bizarre behavior has been observed.  Psychotic or borderline psychotic symptoms seem to be present" (*id*.).

Again, Dr. Kolade diagnosed Plaintiff with "[s]chizophrenia" and "[u]nspecified [a]nxiety [d]isorder" at this very session.  *Id*.  In fact, Dr. Kolade recommended hospitalization following this session specifically "because this patient's condition requires 24 hour monitoring due to potential danger to self or others or severe deterioration of level of functioning or need for medically monitored detoxification , and less intensive treatment has failed or is likely to fail."  AR 516.

The ALJ ignores all of these notes for unknown reasons, which preclude the Court from finding that the ALJ's reasoning is supported by substantial evidence.  In contrast, when Dr. Kolade's treatment notes are viewed as a whole, his finding of debilitating functional limitations is consistent with the evidence in the record.  Accordingly, the ALJ's failure to discuss the full diagnostic picture provided by Plaintiff's treating physician constitutes reversible error.

### 3.    The ALJ's Credibility Determination of Claimant is Not Supported by Clear and Convincing Reasons

The ALJ must engage in a two-step analysis when evaluating a claimant's testimony concerning pain, symptoms, and level of limitation is credible.  *Garrison*, 759 F.3d at 1014.  First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036, *citing Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.

1991) (en banc).  Second, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony concerning the severity of his symptoms only by offering specific, clear and convincing reasons for doing so."  *Garrison*, 759 F.3d at 1014–15 (internal citation omitted).  An ALJ's finding on this matter must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective testimony. *Thomas v. Barnhart*, 278 F.3d 948, 958 (9th Cir. 2002) (citation omitted).

In weighing a claimant's credibility for cases involving ALJ decisions rendered on or after March 24, 2016, which includes the present case, the ALJ may consider Plaintiff's: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p (eff. Mar. 16, 2016), 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c), 416.929 (c).[25]  The ALJ is instructed to "consider all of the evidence in an individual's record . . . [to] determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, 2016 WL 1119029 at *2.  Notwithstanding, a claimant's statements about his pain or other symptoms alone will not establish that he is disabled.  20 C.F.R. § 416.929(a)(1); 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability.").  A claimant is not entitled to benefits under the Social Security Act unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.  *Strauss v. Comm'r Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

Plaintiff argues the ALJ erred by failing to articulate clear and convincing reasons for discounting Plaintiff's subjective complaints.  ECF No. 12 at 16–18.  The ALJ found Plaintiff's

---

[25]     SSR 96-7p was superseded by SSR 16-3p in March 2016.  SSR 16-3p "eliminat[es] the use of the term 'credibility' .... [to] clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, 2016 WL 1119029 at *1.  However, both regulations require an ALJ to consider the same factors in evaluating the intensity, persistence and limiting effects of an individual's symptoms.  *Id*. at *7; SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

medically determinable impairments could reasonably be expected to cause the alleged symptoms at step one of the *Garrison* analysis. AR 18. However, at step two, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for seven reasons. AR 18–21. The ALJ found Plaintiff less than credible because: (a) Plaintiff's testimony conflicted with his reports of daily living (AR 16, 18–19); (b) Plaintiff collected unemployment income after the alleged onset date of disability (AR 22); (c) Plaintiff's symptoms were controlled with treatment (AR 19–20); (d) Plaintiff contributed to his symptoms by not complying with prescribed treatment (AR 18–19); (e) Plaintiff's testimony conflicted with the objective medical evidence (AR 19–20); (f) Plaintiff's statements were internally inconsistent (AR 19); and, (g) Plaintiff's statements contradicted the medical opinion evidence provided by nontreating sources (AR 19, 21). The Court disagrees with each of the ALJ's findings.

### a.   Plaintiff's testimony did not conflict with his reports of daily living.

The ALJ may consider a claimant's activities that undermine reported symptoms. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). If a claimant can spend a substantial part of the day engaged in pursuits involving the performance of exertional or non-exertional functions, the ALJ may find these activities inconsistent with the reported disabling symptoms. *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012). "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discount a claimant's symptom claims when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Id*. at 1112–13.

Plaintiff's reported daily activities, singularly and cumulatively, are insufficient to indicate that Plaintiff's capacities are transferable to a work setting. *Id*. At his psychological evaluation, Plaintiff told Dr. Browning that he "lay[s] in a room, star[es] at walls, watch[es] TV, and forget[s] to eat" on a daily basis. AR 382. Plaintiff does not do any household chores, except once per month when manic. *Id*. Plaintiff has no outside activities or hobbies. *Id*. Consistent with this, Plaintiff testified at his administrative hearing that he "can't even come out of [his] room . . . . Maybe twice a week, [Plaintiff will] come out – maybe twice every two weeks." AR 49.

Despite this evidence, the ALJ found that Plaintiff has no limitations in performing activities of daily living because:

> [a]t the hearing, the claimant testified that he does have a driver's license and is able to drive a car. . . . [T]he claimant has generally attended his therapy sessions on a pretty consistent basis.  At an evaluation in September 2013, the claimant reported that he is able to engage in household chores and go out alone.

AR 18–19, *citing* AR 35–36.  Plaintiff, however, demonstrates that these activities of daily living are "not inconsistent with [his] testimony that he is unable to be around people or sustain focus for long enough to make it through a typical work day," because "an ability to attend a mental health therapy appointment or sit in [a] room watching television and avoiding people all day does not demonstrate that Plaintiff can sustain work activity."  ECF No. 12 at 18:5–7, 10–12; ECF No. 17 at 6:20–22, 25–27.

Indeed, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits."  *Fair*, 885 F.2d at 603 (internal citations omitted).  Retaining the ability to drive a car, attend therapy sessions, or conduct household chores does not equate to Plaintiff being "able to spend a substantial part of his day engaged in pursuits involving the performance of physician functions that are transferable to a work setting."  *Id.* (internal alteration omitted).  Moreover, "[t]he VE's testimony established that a person who would be unable to maintain regular attendance, be punctual, and be around other people without being distracted by them or causing a distraction, as Plaintiff's testimony describes, would not be able to sustain competitive employment."  *Id.* at 18:13–16.  Accordingly, Plaintiff's reported activities of daily living do not provide clear and convincing reasons to find Plaintiff's testimony was not credible.

b.  <u>The ALJ improperly discounted Plaintiff's credibility on the basis of his receipt of unemployment income after the alleged onset date of disability because the record does not demonstrate whether Plaintiff held himself out as available for full-time or part-time work</u>.

"[R]eceipt of unemployment benefits can undermine a claimant's alleged inability to work fulltime."  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161–62 (9th Cir. 2008), *citing Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988).  But where the record "does not establish

whether [the claimant] held himself out as available for full-time or part-time work," such a "basis for the ALJ's credibility finding is not supported by substantial evidence," as "[o]nly the former is inconsistent with his disability allegations." *Id*.

Here, "the record does not establish whether Plaintiff held himself out as available for full-time or part-time work." ECF No. 12 at 17:8–9. On this basis alone, Plaintiff's receipt of unemployment benefits does not provide substantial evidence to support the ALJ's decision to discredit Plaintiff's testimony. Further, Defendant does not rebut Plaintiff's argument on this issue in its Opposition and Cross-Motion, and therefore, the Court deems this argument waived. *Justice v. Rockwell Collins. Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 F. App'x 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). Therefore, the ALJ therefore erred in discounting Plaintiff's credibility on the basis of receipt of unemployment benefits, without first inquiring into whether Plaintiff held himself out for part-time or full-time work.

c. The ALJ improperly discounted Plaintiff's credibility based on his purported noncompliance with treatment because the ALJ failed to follow the procedures outlined in SSR 82-59.

Unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment may serve as a basis to discount the claimant's reported symptoms unless there is a good reason for the failure. *Orn*, 495 F.3d at 638. In particular, disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds. *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). SSR 16-3p instructs that an ALJ "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." 2016 WL 1119029 at *8. For example, "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services." *Id*. at *9.

As a threshold matter, Defendant contends Plaintiff failed to address, and therefore conceded, to the ALJ's finding with respect to Plaintiff's noncompliance with medication. ECF No. 15 at 12:2–

4. To the contrary, Plaintiff addresses the ALJ's reliance on his alleged noncompliance with medication in his opening brief. *See* ECF No. 12 at 13:24–26 ("The ALJ improperly speculates that Plaintiff's impairments could improve to the point of non-disability if Plaintiff refrained from using substances and was fully compliant with his medications."). Therefore, this argument by Defendant has no merit.

The ALJ next cites to three instances where Plaintiff supposedly failed to comply with his medication regimen:

- The claimant was admitted from November 27-30, 2012 on a Legal 2000, a proceeding for an involuntary court-ordered admission of an individual in the State of Nevada . . . . The claimant reported crying spells, severe anxiety, and thoughts of death. However, the records stated that the claimant had quit Seroquel a week before. (AR 19);

- The claimant was again admitted from February 14-18, 2013 for depression and suicidal symptoms . . . . The claimant reported intrusive thoughts and hallucinations telling him to give up. However, the records stated that the claimant was not taking medication. (*id*.); and,

- The claimant had an episode of decompensation in December 2013, but notations indicated he had been off his medication for over a month . . . . *Id.*

ALJ Bennett also "found that the claimant's documented use of alcohol and substances show the claimant's noncompliance with prescribed treatment." AR 21. Plaintiff, rebuts this argument by demonstrating that "[t]he times when [he] self-adjusted his medications and skipped doses are clear manifestations of his mental impairments." ECF No. 17 at 5:19–21.

Irrespective of these arguments, Plaintiff convincingly points out that "[i]f the ALJ wished to find that failure to follow prescribed treatment was an issue in this case, then the ALJ was required to follow the procedures outlined in Social Security Ruling 82-59." ECF No. 12 at 13:28–14:1. SSR 82-59 (eff. until Oct. 28, 2018) states:

SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

3.  Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4.  The evidence of record discloses that there has been refusal to follow prescribed treatment.

Here, not only did the ALJ fail to follow this ruling, but conditions three and four of SSR 82-59 are not met because as Plaintiff explains, "Dr. Kolade . . . has not opined that Plaintiff's prescribed treatments would be clearly expected to restore Plaintiff's capacity to work, and the evidence does not document that Plaintiff has refused to follow such a prescribed treatment." ECF No. 12 at 14:10–13.

Further, the record demonstrates that Plaintiff generally complied with his medication, apart from periods of time where his insurance coverage lapsed.[26] AR 50, 52–53.  On one occasion, Plaintiff reported to an attending physician that he "had no medications . . . for a few days before admission [to an outpatient intensive program] because of . . . financial difficulties so he was getting more and more depressed." AR 376.  Then, at the mental status examination with Dr. Browning, Plaintiff confided that he could "not go back to the clinic where he was prescribed [Seroquel] because he has[] a bill that he is not able to pay at this time." AR 379 (internal quotation marks omitted). On another occasion, Plaintiff mentioned that he encountered problems getting his insurance company to approve a new recommended dose of medication.  AR 491.  Put simply, Plaintiff's noncompliance with his medication regimen does not amount to a "refusal to follow prescribed treatment." SSR 82-59.  Based on this record, Plaintiff's deviation from treatment recommendations fell short of being a specific, clear, and convincing reason to discount his symptoms complaints.

d.    The ALJ improperly discounted Plaintiff's credibility based on the efficacy of treatment because Plaintiff's responsiveness to medication was inconsistent.

The effectiveness of treatment is a relevant factor in determining the severity of a claimant's symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2011); *Tommasetti*, 533 F.3d at 1040

---

[26]    The Court acknowledges that Plaintiff told his physician at Southern Nevada Adult Mental Health Services on May 16, 2014 that "Trazodone did not help, and he stopped taking it" (AR 522), and testified at his May 6, 2016 administrative hearing that he will sometimes skip a dose of medication when he has trouble sleeping (AR 52). Notwithstanding, the Court finds that Plaintiff's self-reported decisions to abstain from taking medication do not rise to the level of noncompliance because Plaintiff provided good reasons for doing so.  *Orn*, 495 F.3d at 638.  Specifically, SSR 16-3p recognizes that "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." 2016 WL 1119029 at *9.

(recognizing that a favorable response to treatment can undermine a claimant's complaints of debilitating pain or other severe limitations); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (providing that conditions effectively controlled with medication are not disabling for purposes of determining eligibility for benefits).

As a preliminary matter, Defendant alleges that Plaintiff has conceded to the validity of the ALJ's findings with respect to the efficacy of treatment because Plaintiff "does not address the ALJ's reliance on his admission that he was stable on medication." ECF No. 15 at 12:2–3. However, in his Motion for Remand, Plaintiff clearly argues that "[t]he ALJ's assertion that Plaintiff's impairments are stable generally and only become unstable when he stops taking medications is inconsistent with the record." ECF No. 12 at 13:19–21. Therefore, Plaintiff has not conceded this argument.

Turning to the substance, the ALJ discounted Plaintiff's credibility because Plaintiff "reported . . . he was stable on medication" (AR 20, citing AR 481), and Plaintiff's "[b]ehavior [was] stable and uneventful . . . when medication compliance is good (*id.*, citing AR 536). Plaintiff maintains that "[t]he ALJ's assertion that Plaintiff's impairments are stable with medication is not supported by the record, which shows repeated episodes of symptom exacerbation even when Plaintiff has been fully complaint with his medications." ECF No. 17 at 4:4–7, *citing* AR 479–90, 491–501, 535–69.

The medical record supports Plaintiff's argument. "[E]ven when Plaintiff [did] comply with prescribed treatment, he continue[d] to have episodes of auditory hallucinations, mood swings, severe depression, and suicidal ideation." ECF No. 12 at 14:17–19, *citing* AR 536, 548, 551, 564–65. Plaintiff previously reported that: "Trazodone did not help" (AR 522); "he did not think Zoloft is working" (*id.*); and, "his current medications have been mostly ineffective for him" (AR 572). On at least one occasion, Dr. Kolade noted that Plaintiff "show[ed] minimal apparent treatment response." AR 551. These reports and observations are consistent with Plaintiff's testimony at his administrative hearing at which he stated his medication "helps [him] sometimes, and then . . . it [doesn't] help." AR 44. Plaintiff further testified that his medication is "not working for [him] . . . [he] can't sleep, [his] stress, [his] anxiety don't go away. [He's] really aggravated." AR 46.

Based on the above, the ALJ's finding that Plaintiff's impairments when treated were not as limiting as Plaintiff claimed was not supported by substantial evidence and, therefore, did not constitute a clear and convincing reason to discount Plaintiff's symptoms complaints.

> e. <u>The ALJ improperly discounted Plaintiff's credibility based on conflicts between his testimony and the objective medical evidence because the ALJ failed to view the medical evidence as a whole.</u>

When determining the extent of Plaintiff's symptoms, the ALJ must consider whether there are any conflicts between Plaintiff's statements and the objective medical evidence. 20 C.F.R. § 416.929(c)(4). However, an ALJ may not discredit a claimant's symptom testimony and deny benefits solely because the degree of the symptoms alleged is not supported by objective medical evidence. *Rollins*, 261 F.3d at 857; *Bunnell*, 947 F.2d at 346–47; *Fair*, 885 F.2d at 601. SSR 16-3 provides that the disability "determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."

With respect to mental health issues, the Ninth Circuit holds that:

> it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*Garrison*, 759 F.3d at 1017.

Plaintiff accuses the ALJ of "referr[ing] to the objective evidence in general, asserting it was inconsistent with Plaintiff's allegations regarding the intensity of his symptoms." ECF No. 12 at 17:15–16, *citing* AR 22. This contradicts the ALJ's findings in which he references clinical findings "reveal[ing] a level of functioning beyond Plaintiff's alleged symptoms and limitations." ECF No. 15 at 10:8–10, *citing* AR 19–20, 378, 380–83, 497–500, 520, 555, 558; *see also* 20 C.F.R. § 404.1529(c)(2), (4). But, and notwithstanding the ALJ's findings, the Court finds Plaintiff's testimony should not have been discounted because of its alleged conflict with the objective medical evidence. Circuit precedent cautions ALJs against cherry picking "a few isolated instances of improvement over a period of months or years" in making a credibility finding. *Garrison*, 759 F.3d

at 1017. This is precisely what occurred here. When viewed as a whole, the medical evidence demonstrates that Plaintiff's symptoms waxed and waned in the course of treatment, which is a common occurrence for a mental health condition such as bipolar disorder. *Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature of bipolar disorder that symptoms wax and wane over time").

For example, Defendant points to Dr. Browning's psychological evaluation as evidence that Plaintiff: "[n]ever [had thoughts] distorted to a psychotic degree'; . . . had no perceptual disturbances; and[, ] had no hallucinations, delusions, or psychosis." ECF No. 15 at 10:19–20, *citing* AR 19, 381. However, this examination took place just two and a half months before Plaintiff was admitted to the emergency room at North Vista Hospital for attempted suicide. AR 388, 393; *see also Attmore*, 827 F.3d at 878 ("Although the ALJ pointed to isolated signs of improvement, the ALJ could not find medical improvement on that basis unless the ups and downs of Attmore's development showed *sustained* improvement) (internal citation omitted); *Garrison,* 759 F.3d at 1017; *Holohan*, 246 F.3d at 1205 ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Moreover, even when Plaintiff complied with treatment, he would continue suffering from the same—and occasionally, more severe—symptoms. AR 44, 46, 536, 548, 551, 564–65.

The Court finds that the perceived inconsistency between Plaintiff's statements about his symptoms and the medical evidence could be reasonably understood as fluctuations correlating to the ebb and flow of Plaintiff's psychological illness. Accordingly, the alleged inconsistency between Plaintiff's testimony and the objective medical evidence did not provide a clear and convincing basis for the ALJ to make an adverse credibility finding.

          f.    <u>The ALJ improperly discounted Plaintiff's credibility because his statements about his symptoms were not internally inconsistent.</u>

When evaluating a claimant's symptom claims an ALJ may consider the consistency of an individual's statements made in connection with the disability review process and any other existing statements or conduct under other circumstances. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir.

1996).  Despite this ALJ authority, Social Security Regulations states that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve over time."  SSR 16-3p, 2016 WL 1119029 at *8.

Defendant claims "Plaintiff testified that he usually stayed in his room all day, only came out of his room 'maybe twice every two weeks,' and did not want to be around anyone . . . .  Yet, he was cooperative and friendly during medical examinations and had previously reported having significant relationships with family and friends."  ECF No. 15 at 10:26–11:2, *citing* AR 19, 49, 382; *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224–25 (9th Cir. 2010).  For support of the ALJ's findings, Defendant cites to a case in which the Ninth Circuit "affirm[ed] rejection of the claimant's allegation [that] he could not 'put up' with most people because two physicians found he was cooperative and pleasant, he reported controlling his anger, and he was capable of developing a personal relationship."  ECF No. 15 at 11:2–5, *citing Turner*, 613 F.3d at 1224–25.  Plaintiff argues that the alleged inconsistencies in Plaintiff's statements are "an example of the Commissioner . . . attempting to set forth Plaintiff's ability to cooperate with his mental health therapist as an example of an ability to function socially in other contexts."  ECF No. 17 at 6:15–17.  Plaintiff is right.  The medical record clearly reflects that Plaintiff's symptoms ranged from auditory hallucinations and suicide attempts to periods of relative calm.

There are key distinctions between the facts in *Turner*, on which Defendant relies, and the case at bar.  In *Turner* the claimant: *expressly* told his doctor that "he had been able to develop control over his anger," "develop[ed] a personal relationship during this time that resulted in marriage" despite his alleged need for isolation, and "stated his back pain limited his ability to stand, sit, and walk, but then described [during his hearings and on his disability application] that his work on the ranch involved building fences, running a tractor, feeding cattle, and laying irrigation waterlines."  *Turner*, 613 F.3d at 1225.  Here, in line with Plaintiff's testimony, Plaintiff's mother conceded that Plaintiff *previously* had significant relationships with family and friends, but that is not the case at present.  AR 293 ("[Plaintiff] used to go out shopping [ and] visit[] people [and]

friends [but] now [h]e has [c]hanged [d]ramatically"). These symptomatic observations are consistent with the ebb and flow expected of an individual diagnosed with bipolar disorder. *Attmore*, 827 F.3d at 878.

Accordingly, the ALJ's conclusion regarding Plaintiff's allegedly inconsistent statements did not constitute a clear and convincing reason for the ALJ to discount Plaintiff's symptom reports.

> g. <u>Although Plaintiff failed to address the contradictory medical opinion evidence provided by nontreating sources, Plaintiff's statements about his symptoms were supported by other medical documentation.</u>

A "contrary opinion of a non-examining medical expert may constitute substantial evidence when it is consistent with other independent evidence in the record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Lester*, 81 F.3d at 830–31. The ALJ is not required to make specific findings before rejecting a claimant's subjective allegation of pain when "nontreating physician[s] rel[y] on independent clinical findings that differ from the findings of the treating physician. . . . [T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence that [the claimant] is no longer disabled." *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).

The regulations in effect at the time of the ALJ's decision state that:

> [f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge . . . level[] of administrative review. Administrative law judges . . . may not ignore these opinions and must explain the weight to these opinions in their decisions.

SSR 96-6p (eff. until March 26, 2017). This is because "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*

Defendant maintains that Plaintiff failed to address, and therefore conceded to, the ALJ's finding that opinion evidence from nontreating medical sources contradicted Plaintiff's claims regarding his functional capabilities. ECF No. 15 at 12:4–5. A review of Plaintiff's opening brief shows this to be true, and accordingly, such "[a]rguments not addressed in a brief are deemed abandoned." *Wilcox v. C.I.S.*, 848 F.2d 1007, 1008 n.2 (9th Cir. 1998). That being said, however,

Plaintiff's reports of daily living, adherence to treatment, tolerance to medication, fluctuating symptoms, and objective medical evidence all support the Court's conclusion that Plaintiff's testimony was credible.  Thus, when reviewing "all of the evidence in [Plaintiff's] record," the ALJ should not have relied on this factor to conclude Plaintiff's testimony lacked credibility.  SSR 16-3p, 2016 WL 1119029 at *2.

### 4.    Plaintiff's Lay Witness Testimony

An ALJ must consider the statement of lay witnesses in determining whether a claimant is disabled.  *Stout*, 454 F.3d at 1053.  Lay witness evidence cannot establish the existence of medically determinable impairments, but lay witness evidence is "competent evidence" as to "how an impairment affects [a claimant's] ability to work."  *Id*.; 20 C.F.R. § 416.913; *see also Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir. 1993) ("[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition.").  "The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.  To the contrary, testimony from lay witnesses who see the claimant every day is of particular value."  *Smolen*, 80 F.3d at 1289 (internal citations omitted).  The ALJ is not required "to discuss every witness's testimony on a[n] individualized, witness-by-witness basis.  Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina*, 674 F.3d at 1114.

Plaintiff's mother, Judy Gutierrez, submitted a Third Party Function Report describing her son's limitations.  AR 288–94.  Defendant maintains that "[a]lthough the ALJ did not expressly discuss Plaintiff's mother's report, any error is harmless because Plaintiff's mother's statements are duplicative of Plaintiff's own allegations."  ECF No. 15 at 12:26–28.  Juxtaposing Plaintiff's claims alongside the lay witness testimony shows this to be true:

- "[Plaintiff] argues his mother stated he had bipolar disorder and anxiety, yet he also alleged these impairments" (ECF No. 15 at 13:5–6, citing AR 289–94, 314);

- "[Plaintiff] states his mother said he slept poorly, yet he also said symptoms impacted his sleep" (*id*. at 13:6–7, citing AR 289–94, 314);

- "[Plaintiff's] mother stated he experienced hallucinations, which he also alleged" (*id*. at 13:7–8, citing AR 289–94, 309);

45

- "Like his mother, Plaintiff claimed he stayed in his room all day and isolated himself" (*id.* at 13:8–9, citing AR 49, 289–94);

- "Plaintiff's mother reported he did not care about his hygiene or eating, but Plaintiff also made these same claims" (*id.* at 13:9–11, citing AR 289–94, 310);

- "[Plaintiff's] mother said he needed reminders to bathe, eat, and take medication, which he also claimed" (*id.* at 13:11–12, citing AR 289–94, 311);

- "Both Plaintiff and his mother alleged Plaintiff experienced panic attacks" (*id.* at 13:12–13, citing AR 51, 289–94); and,

- "[Plaintiff's mother] checked lifting, squatting, bending, sitting, kneeling, talking, memory, completing tasks, understanding, following instructions, and getting along with others as abilities affected by Plaintiff's conditions," (AR 293) whereas Plaintiff checked the same limitations, with the exception of "sitting" and "kneeling," and the addition of "standing," "walking," "talking," and "stair climbing" (AR 314).

Although the lay witness testimony is closely aligned with Plaintiff's symptom testimony, the ALJ erred in neglecting the lay witness testimony based on similarity between the two testimonials because the ALJ did not provide clear and convincing reasons for rejecting Plaintiff's testimony. Further, Plaintiff correctly points out that "[i]f an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are entitled to deference, it must be upheld on the rational[e] set forth by the agency itself." ECF No. 17 at 8:11–14, *citing Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943). An ALJ is entitled to provide the same reasons for rejecting similar testimony by a different witness when he properly rejects testimony by the first witness. *Molina*, 674 F.3d at 1114. Here, however, the ALJ improperly rejected Plaintiff's witness testimony, and therefore, Plaintiff's testimony cannot serve as a basis for rejecting Plaintiff's lay witness testimony.

### 5.    The ALJ's Step Five Finding

At step five of the sequential evaluation analysis, the burden shifts to the Commissioner to establish that (1) the claimant can perform other work, and (2) such work "exists in significant numbers in the national economy." 20 C.F.R. §§ 404.1560(c)(2); 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012). In assessing whether there is work available, the ALJ must rely on complete hypotheticals posed to a vocational expert. *Nguyen*, 100 F.3d at 1467. The ALJ's hypothetical must be based on medical assumptions supported by substantial evidence in the record

that reflects all of the claimant's limitations.  *Osenbrook v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).  The hypothetical should be "accurate, detailed, and supported by the medical record." *Tackett*, 180 F.3d at 1101.

The hypothetical that ultimately serves as the basis for the ALJ's determination, i.e., the hypothetical that is predicated on the ALJ's final RFC assessment, must account for all the limitations and restrictions of the claimant.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).  "If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."  *Id*. (internal citation omitted).  However, the ALJ "is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."  *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006) (internal citation and quotation marks omitted).  Therefore, the ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel if they are not supported by substantial evidence.  *Magallanes*, 881 F.2d at 756–57; *Martinez*, 807 F.2d at 773.  A claimant fails to establish that a step five determination is flawed by simply restating argument that the ALJ improperly discounted certain evidence, when the record demonstrates the evidence was properly rejected. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175–76 (9th Cir. 2008).

Relying on the testimony provided by the VE, ALJ Bennett found Plaintiff could perform the "light, unskilled" occupations of "fast food worker, DOT 311.472-010, . . . with 1 million jobs nationally and 6000 jobs in Nevada"; "assembler, DOT 729.687-010, . . . with 50,000 jobs nationally and 200 jobs in Nevada"; and, "mail clerk, DOT 209.687-026, . . . with 86,000 jobs nationally and 400 jobs in Nevada."  AR 23–24.  Plaintiff argues the ALJ erred at step five in three respects, which the Court discusses below.  ECF No. 12 at 19:24–20:22, ECF No. 17 at 8:19–9:14.

        a.   <u>The mail clerk and fast food worker occupations are inconsistent with the ALJ's RFC finding</u>.

Plaintiff claims:

The occupation of mail clerk is inconsistent with the ALJ's own finding limiting Plaintiff to simple, repetitive tasks.  . . . According to the DOT, the occupation of mail clerk has GED Reasoning Level of 3.  Jobs with a Reasoning Level of 3 are eliminated for a person with Plaintiff's limitations, as found by the ALJ.

ECF No. 12 at 19:27–20:3, *citing* AR 17; *Zavalin v. Colvin*, 778 F.3d 842 (9th Cir. 2015).  Plaintiff also contends the ALJ erred in finding that Plaintiff could work as a fast food worker, because "[t]he ALJ's RFC finding . . . limited Plaintiff to occasional contact with supervisors, coworkers, and the public[, but] the occupation of fast food worker primarily involves taking orders from and serving customers."  ECF No. 12 at 20:4–6.  Defendant does not address Plaintiff's allegations of inconsistency in its Cross-Motion.  Therefore, "the Commissioner appears to concede that two of the jobs the ALJ identified at step five, mail clerk and fast food worker, are improper for Plaintiff and inconsistent with the ALJ's own RFC finding."  ECF No. 17 at 8:20–22; *see also Justice*, 117 F.Supp.3d at 1134.

                        b.      <u>Notwithstanding the ALJ's incomplete hypothetical, the VE was not required to discuss whether the assembler occupation exists in significant numbers in the national economy.</u>

"'Work which exists in the national economy' can be satisfied by 'work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country.'  42 U.S.C. § 1382c(a)(3)(B) (emphasis added); *Beltran*, 700 F.3d at 389–90."  *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 528 (9th Cir. 2014).  This Court must therefore "consider whether substantial evidence supports the ALJ's decision that [50,000] national [assembler] jobs constituted 'work which exist[ed] in significant numbers . . . in several regions of the country.'"  *Id*. (internal citations omitted); *see also* AR 57.

Alleging that "two of the three jobs identified by the ALJ at step five [i.e., the mail clerk and fast food worker occupations] are improper," Plaintiff argues it was reversible error for "[t]he VE [to fail to] address whether the one remaining occupation, assembler, exists in significant numbers by itself."  ECF No. 12 at 20:7–8.  Defendant counterargues that Plaintiff's failure to dispute whether "he [is] capable of performing the assembler position . . . is fatal to his argument."  ECF No. 15 at 14:8–9.  Defendant also notes that "neither the Act nor the regulations" require the VE to "address whether [the assembler position] existed in significant numbers in the national economy."  *Id*. at 14:10–12.

Plaintiff's argument lacks merit.  Indeed, "[w]hether there are a significant number of jobs a claimant is able to perform with his limitations is a question of fact to be determined by a judicial

officer," not by the vocational expert. *Martinez*, 807 F.2d at 775.  There is no "bright-line rule for what constitutes a 'significant number' of jobs." *Beltran*, 700 F.3d at 389.  However, "25,000 jobs [has been found to] meet the statutory standard." *Gutierrez*, 740 F.3d at 528.  Here, the VE testified that "50,000 national [assembler] jobs" exist in the national economy, which is twice as much as the figure meeting the statutory standard.  AR 57.  Accordingly, the VE did not err in failing to discuss whether the assembler position exists in significant numbers in the national economy.  Nevertheless, the hypothetical that the ALJ posed to the VE did not reflect all of the claimant's limitations, and therefore, the VE's testimony had no evidentiary value.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("If an ALJ's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.").

### c.   The ALJ inaccurately posed all of Plaintiff's limitations to the VE.

Plaintiff claims the VE's testimony has no evidentiary value because "the ALJ[] fail[ed to] accurately . . . pose all of Plaintiff's limitations" by "omitt[ing] Plaintiff's credible allegations[,] those of the lay witness[, and] the limitations assessed by Plaintiff's treating doctor."  ECF No. 12 at 20:16–20.  Therefore, Plaintiff alleges that "the VE's testimony that Plaintiff could perform the occupations identified by the ALJ" was flawed.  *Id*. at 20:18–19.

As discussed above, the ALJ's RFC need only include those limitations found credible and supported by substantial evidence.  *Bayliss*, 427 F.3d at 1217 ("The hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record.").  Here, Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms should not have been discounted because his testimony and the testimony of his lay witness are supported by substantial evidence as explained above in this Report and Recommendation.   The ALJ was not entitled to disregard Plaintiff's limitations when formulating his RFC.  Thus, the VE relied on an incomplete hypothetical posed by the ALJ and the ALJ's step five finding was not supported by substantial evidence.

# IV.    REMEDY REQUEST

Plaintiff requests that this case be remanded with instructions to pay benefits.  ECF No. 12 at 20:23–21:24; ECF No. 17 at 9:15–28.  In *Garrison*, the Ninth Circuit:

> devised a three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

759 F.3d at 1020 (internal citation omitted).[27]

In this case, the first part of the credit-as-true test is not satisfied.  Specifically, further administrative proceedings would serve a useful purpose in this matter, given the internal discrepancies contained in Dr. Kolade's Medical Impairment Questionnaire.  *Cf. Colwell v. Colvin*, 2:15-CV-782 JCM (GWF), 2018 WL 2020829, *2–4 (D. Nev. May 1, 2018) (finding a remand solely for benefits inappropriate because "several evidentiary questions . . . remain[ed] unsolved after reviewing the record of administrative proceedings," including whether "the medical opinions . . . demonstrate[d] evidentiary inconsistencies as to the seriousness of plaintiff's physical and emotional disabilities").  Accordingly, remanding this matter for an immediate payment of benefits is inappropriate at this time.  However, because Plaintiff met the required level of severity for depressive syndrome and bipolar disorder under Listing 12.04, the Court recommends that this case be remanded for further proceedings consistent with this Report and Recommendation under the Compassionate Allowances program, which is an initiative designed to identify cases that are likely to meet the Social Security's standards for disability benefits.  Compassionate Allowances, https://www.ssa.gov/compassionateallowances/ (last visited Feb. 10, 2020).

---

[27]    The Ninth Circuit, "not convinced that the 'crediting as true' doctrine is mandatory," has exercised flexibility on other occasions and "remanded solely to allow an ALJ to make specific credibility findings."  *Connett*, 340 F.3d at 876.  That being said, "*Connett*'s 'flexibility' is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled."  *Garrison*, 759 F.3d at 1021.  Here, there is no serious doubt that Plaintiff is disabled under the Social Security regulations, and therefore, the Court applies the credit-as-true standard to this case.

## V.   CONCLUSION

Plaintiff has produced substantial evidence demonstrating that his impairment meets a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 and, therefore, the ALJ should have found him disabled under the Act.  Although the disability determination should have stopped at step three of the five-step sequential evaluation process established by the Commissioner, the Court considered all the arguments put forth by the parties in their briefings and finds a remand for further administrative proceedings is appropriate at this time.

The ALJ failed to demonstrate, using the specific and legitimate standard, that Plaintiff's treating physician's opinion should be rejected in its entirety, because Plaintiff's treating physician's treatment records were consistent with his assessment finding debilitating functional limitations.

The ALJ failed to demonstrate, with clear and convincing reasons, that Plaintiff's testimony should be discounted because (i) Plaintiff's testimony did not conflict with his reports of daily living, (ii) the record does not show whether Plaintiff held himself out as available for part or full-time work and, as such, the ALJ did not have substantial evidence that Plaintiff's receipt of unemployment benefits, after the alleged onset date of disability, precluded a finding of disability under the Act, (iii) Plaintiff complied with prescribed treatment to the best of his abilities, (iv) Plaintiff's symptoms were not controlled with treatment, (v) the ALJ did not view the medical evidence as a whole and, (vi) Plaintiff's statements coincided with his fluctuating symptoms of bipolar disorder.   The nontreating sources' contrary opinions defer to the weight of the above considerations.

Because the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's testimony, the ALJ erred in rejecting the lay witness testimony due to its perceived similarity to Plaintiff's testimony.

The ALJ's step five finding was not supported by substantial evidence, because he improperly discounted the limitations alleged by Plaintiff and his lay witness testimony.  This in turn led to the ALJ formulating a faulty RFC and articulating an incomplete hypothetical to the VE.

## VI.   RECOMMENDATION

IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Reversal and Remand (ECF No. 12) be GRANTED, and that Defendant's Cross Motion to Affirm (ECF No. 15) be DENIED.

IT IS FURTHER RECOMMENDED that this matter be remanded to the Social Security Administration under the Compassionate Allowances program for further administrative proceedings consistent with this Report and Recommendation.

IT IS FURTHER RECOMMENDED that remand be pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS FURTHER RECOMMENDED that Plaintiff be permitted to submit additional evidence within **60** days of the date of the District Court's Order, and, if needed, receive a new hearing within **150** days of the date of the District Court's Order, unless Plaintiff is unable to proceed within that timeframe.

IT IS FURTHER RECOMMENDED that the ALJ reevaluate all remaining evidence to assess Plaintiff's symptoms and limitations.

IT IS FURTHER RECOMMENDED that the ALJ take any further action needed to complete the administrative record and to promptly issue a new decision.

IT IS FURTHER RECOMMENDED that the ALJ issue a new decision on Plaintiff's application for benefits within **30 days** after the record closes at the hearing level.

IT IS FURTHER RECOMMENDED that Plaintiff be allowed to return to federal court within **60 days** after the ALJ's opinion on remand if the ALJ does not issue a favorable decision. Plaintiff need not wait for Appeals Council review.

DATED this 12th day of February, 2020.

_____
ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also

1

2

3

4

held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28